1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

U.S. DISTRICT COURT
DISTRICT OF NH
FILED

2019 JAN -3  A II: 33

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* JAIDEEP S. CHAWLA,<br><br>    *Plaintiff* and *Relator*,<br><br>COMMONWEALTH OF MASSACHUSETTS<br>*ex rel.* JAIDEEP S. CHAWLA,<br><br>    *Plaintiff* and *Relator*,<br><br>MASSACHUSETTS DEPARTMENT OF REVENUE<br>*ex rel.* JAIDEEP S. CHAWLA,<br><br>    *Plaintiff* and *Relator*,<br><br>and<br><br>JAIDEEP S. CHAWLA,<br><br>    *Plaintiff*,<br><br>v.<br><br>INTERNAL REVENUE SERVICE,<br><br>REAL PROPERTY LOCATED IN WASHINGTON,<br>DISTRICT OF COLUMBIA,<br><br>REAL PROPERTY LOCATED IN BROOKLINE,<br>COUNTY OF NORFOLK, COMMONWEALTH OF<br>MASSACHUSETTS,<br><br>REAL PROPERTY LOCATED IN NORTH ANDOVER,<br>COUNTY OF ESSEX, COMMONWEALTH OF<br>MASSACHUSETTS,<br><br>REAL PROPERTY LOCATED IN WESTON, COUNTY<br>OF MIDDLESEX, COMMONWEALTH OF<br>MASSACHUSETTS, | **FILED *IN CAMERA* AND**<br>**UNDER SEAL PURSUANT**<br>**TO 31 U.S.C. § 3730(b)(2)**<br><br><br>C.A. No.<br><br><br><br>**COMPLAINT AND**<br>**DEMAND FOR TRIAL**<br>**BY JURY** |

REAL PROPERTY LOCATED IN NEWTON CENTRE,   )
COUNTY OF MIDDLESEX, COMMONWEALTH OF   )
MASSACHUSETTS,   )
   )
REAL PROPERTY LOCATED IN CHARLESTOWN,   )
COUNTY OF SUFFOLK, COMMONWEALTH OF   )
MASSACHUSETTS,   )
   )
REAL PROPERTY 1 LOCATED IN BOSTON,   )
COUNTY OF SUFFOLK, COMMONWEALTH OF   )
MASSACHUSETTS,   )
   )
REAL PROPERTY 2 LOCATED IN BOSTON,   )
COUNTY OF SUFFOLK, COMMONWEALTH OF   )
MASSACHUSETTS,   )
   )
REAL PROPERTY 3 LOCATED IN BOSTON,   )
COUNTY OF SUFFOLK, COMMONWEALTH OF   )
MASSACHUSETTS,   )
   )
ONE AUTOMOBILE WITH A CERTAIN   )
MASSACHUSETTS LICENSE PLATE,   )
   )
REAL PROPERTY IN MANCHESTER, COUNTY OF   )
ESSEX, COMMONWEALTH OF MASSACHUSETTS,   )
   )
MASSMAIL EMAIL SYSTEM OF THE   )
COMMONWEALTH OF MASSACHUSETTS,   )
   )
ONE OR MORE EQUITABLE SHARING PROGRAM   )
BANK ACCOUNTS,   )
   )
ONE OR MORE BANK ACCOUNTS OF THE OBAMA   )
FOUNDATION,   )
   )
ONE OR MORE BANK ACCOUNTS OF THE   )
TRUSTEES OF BOSTON COLLEGE,   )
   )
A TOYOTA TACOMA WITH A MASSACHUSETTS   )
LICENSE PLATE,   )
   )
MAURA HEALEY, individually and in her official   )
capacity as Attorney General of the Commonwealth of   )
Massachusetts,   )
   )

ERIC NEYMAN, individually and in his official                            )
capacity as Justice of the Massachusetts Appeals Court,                   )
                                                                          )
C. JEFFREY KINDER, individually and in his official                       )
capacity as Justice of the Massachusetts Appeals Court,                   )
                                                                          )
GEORGE O'TOOLE, JR., individually and in his official                     )
capacity as Chief Judge of the United States District Court               )
for the District of Massachusetts,                                        )
                                                                          )
PATTI SARIS, individually and in her official capacity as                 )
Chief Judge of the United States District Court for the                   )
District of Massachusetts,                                                )
                                                                          )
LEO SOROKIN, individually and in his official capacity                    )
as Judge of the United States District Court for the District             )
of Massachusetts,                                                         )
                                                                          )
ROBERT FARRELL, individually and in his official                          )
capacity as Clerk of the United States District Court for the             )
District of Massachusetts,                                                )
                                                                          )
DEBRA SQUIRES-LEE, individually and in her official                       )
capacity as Justice of the Superior Court of the                          )
Commonwealth,                                                             )
                                                                          )
LINDA GILES, individually and in her official capacity                    )
as Justice of the Superior Court of the Commonwealth,                     )
                                                                          )
AMY CRAFTS, PIERCE CRAY, GILLIAN FEINER,                                  )
DEAN MAZZONE, HOWARD MESHNICK, THOMAS                                     )
MURPHY, JAMES SWEENEY, LORRAINE TARROW,                                   )
JEFFREY WALKER, individually and in their respective                      )
official capacities as Assistant Attorneys General of the                 )
Commonwealth,                                                            )
                                                                          )
MARIS ABBENE, TYLER ARCHER, DAVID                                         )
BARRON, JUDD CARHART, R. MICHAEL CASSIDY,                                 )
MARTHA COAKLEY, KEVIN CURTIN, JOHN                                        )
DAWLEY, BRIAN DURKIN, THOMAS DURKIN,                                      )
MICHAEL FATALE, JOSEPH HERLIHY, SARAH                                     )
HERLIHY, GARY KATZMANN, ELISABETH                                         )
KELLER, THOMAS LAMPERT, DAVID LOWY,                                       )
LORETTA LYNCH, DAVID MACKEY, THOMAS                                       )
MAFFEI, JUSTIN MALONEY, BARACK OBAMA,                                     )
GEORGE O'TOOLE, JR., CARMEN ORTIZ,                                        )

VINCENT ROUGEAU, DONALD SAVERY, DAVID
SIMAS, ROBERT ULLMANN, JOHN VERNER,
GABRIELLE WOLOHOJIAN, individually,

CHRISTOPHER HARDING, in his official capacity
as Commissioner of the Massachusetts Department of
Revenue,

UNITED STATES, U.S. DEPARTMENT OF JUSTICE,
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS,

COMMONWEALTH OF MASSACHUSETTS,
SUPREME JUDICIAL COURT OF THE
COMMONWEALTH, MASSACHUSETTS APPEALS
COURT, SUFFOLK SUPERIOR COURT,

STATE OF COLORADO,

AMERICAN BAR ASSOCIATION,

LAW SCHOOL ADMISSIONS COUNCIL,

TRUSTEES OF BOSTON COLLEGE,

CORNELL UNIVERSITY,

and

WILMER CUTLER PICKERING HALE AND DORR,
LLP,

     *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## **INTRODUCTORY STATEMENT**

1.    This is a civil action (this "Complaint") brought by Jaideep S. Chawla (the "RELATOR"

    or "CHAWLA"), acting *pro se[1]*, for statutory compensation and award pursuant to the

---

[1] The Supreme Court has long held that a filing made in federal court by a party proceeding *pro se* is to be liberally construed. See Haines v. Kerner, 404 U.S. 519, 520-21 ("we hold [the *pro se* pleading] to less stringent standards than formal pleadings drafted by lawyers.") (1972).

False Claims Act (31 U.S.C. § 3730(b)(1)).  Additional claims are made pursuant to federal law, Colorado law, and Massachusetts law.

2.      For the sake of clarity, this Complaint refers to the RELATOR instead of CHAWLA.  As set forth in the Causes of Action section, all claims are brought as a relator under state and/or federal law as well as separately, in an individual capacity.

3.      In connection with the filing of this Complaint, the RELATOR has filed an emergency motion to stay state court proceedings in this Court as to the following cases in Massachusetts state and federal courts:

    a.    Chawla v. Commissioner, et al., No. 18-11383-LTS, in the United States District Court for the District of Massachusetts[2];

    b.    Chawla v. Mass. Appeals Court, No. SJC-12488, in the Massachusetts Supreme Judicial Court at One Pemberton Square, Boston, Massachusetts;

    c.    Chawla & Another v. Gonzalez & Another, No. 2015-P-0483, in the Massachusetts Appeals Court at One Pemberton Square, Boston, Massachusetts;

    d.    Chawla v. Mass. Dep't of Revenue, et al., No. SUCV 2017-2087C, in Suffolk Superior Court at Three Pemberton Square, Boston, Massachusetts; and

    e.    Chawla v. Commonwealth, et al., No. SUCV 2017-3165E, in Suffolk Superior Court at Three Pemberton Square, Boston, Massachusetts.

4.      The RELATOR's status as a relator pursuant to Mass.Gen.Laws ch. 12 § 5C was confirmed by the Massachusetts Appeals Court in the case of Jaideep Chawla & another v. Javier Gonzalez & another, No. 2015-P-0483; 90 Mass. App. Ct. 1102; 56 N.E.3d 894;

---

[2] This case was transferred from this Court and was filed under Case Number 18-238-SM in this Court.

2016 Mass. App. Unpub. LEXIS 836 (May 12, 2017), which was the appeal of

*Commonwealth ex rel. Chawla v. Gonzalez, et al.*, C.A. No. SUCV-2014-2090D (Suffolk

Super. Ct., Apr. 24, 2018) (altogether, the "*Qui Tam* Action").

5.    The RELATOR demands a jury trial for all triable issues in this action.

6.    Allegations marked with an asterisk (*) are "specifically so identified" and "will likely

have evidentiary support after a reasonable opportunity for further investigation or

discovery" pursuant to Fed. R. Civ. P. 11(b)(3).

## NOTICE OF JUDICIAL OFFICIALS AS POTENTIAL WITNESSES

7.    For the reasons stated herein and/or by virtue of their physical presence at Boston College

Law School in Newton, Massachusetts during times relevant to this Complaint, the

following judges of the United States District Court for the District of New Hampshire

are potential witnesses[3] in this action*:

    a.    Paul Barbardoro;

    b.    David Barron;

    c.    William Kayatta, Jr.;

    d.    Robert Katzmann;

    e.    Joseph Laplante;

    f.    Sandra Lynch;

    g.    Landya McCafferty;

    h.    George O'Toole, Jr.;

    i.    F. Dennis Saylor IV.;

    j.    Leo Sorokin; and

---

[3] Some of the federal judges in question are also defendants in the above-captioned action.

    k.    William Young.

8.    By virtue of their participation in Case Number 18-238-SM in this Court, all officials involved in Case Number 18-238-SM in this Court are potential witnesses in this case.

## NOTICE OF RIGGED COURTS IN MASSACHUSETTS

9.    For the reasons stated herein, the RELATOR plausibly alleges that state and federal courts in the Commonwealth of Massachusetts are and/or have been rigged in cases in which the RELATOR was and/or is a party.

10.    For the reasons stated and as to the claims brought herein, the RELATOR reasonably believes that he cannot receive a fair trial or hearing in any court of the Commonwealth of Massachusetts, in the United States District Court for the District of Massachusetts, and/or in the United States Court of Appeals for the First Circuit.

11.    For the reasons stated herein, the RELATOR reasonably expects notice and a hearing prior to any transfer of this proceeding to a different federal district and/or for dismissal by this Court of this action.

## PARTIES

12.    The *qui tam* plaintiff, United States of America (the "United States"), is the government of the United States.

13.    The *qui tam* plaintiff, Commonwealth of Massachusetts (the "Commonwealth" or the "Commonwealth of Massachusetts"), is the sovereign government of the state of Massachusetts.

14.    The *qui tam* plaintiff, Massachusetts Department of Revenue ("DOR"), is a department of the Commonwealth of Massachusetts, having its headquarters at 100 Cambridge Street, Boston, County of Suffolk, Commonwealth of Massachusetts.

15.    The *qui tam* relator, Jaideep S. Chawla ("CHAWLA" or the "RELATOR"), is the relator in the *Qui Tam* Action pursuant to Mass.Gen.Laws ch. 12 § 5C and brings claims pursuant to 31 U.S.C. § 3730(b)(2).

16.    CHAWLA is a plaintiff in his own name in the above-captioned action.

17.    The Defendant, Internal Revenue Service (the "IRS"), is a department, agency, or other entity of the United States government.  The IRS is amenable to suit in all 50 states.

18.    The Defendant, Real Property Located in Washington, District of Columbia ("2446 BELMONT ROAD"), is real property located at 2446 Belmont Road, Washington, District of Columbia.

19.    The Defendant, Real Property Located in Brookline, County of Norfolk, Commonwealth of Massachusetts ("100 DAVIS AVENUE"), is real property located at 100 David Avenue, Brookline, County of Norfolk, Commonwealth of Massachusetts.

20.    The Defendant, Real Property Located in North Andover, County of Essex, Commonwealth of Massachusetts ("43 LISA LANE"), is real property located at 43 Lisa Lane, North Andover, County of Essex, Commonwealth of Massachusetts.

21.    The Defendant, Real Property Located in Weston, County of Middlesex, Commonwealth of Massachusetts ("101 ASH STREET") is real property located at 885 Centre Street, Weston, County of Middlesex, Commonwealth of Massachusetts.

22.    The Defendant, Real Property Located in Newton Centre, County of Middlesex, Commonwealth of Massachusetts ("885 CENTRE STREET") is real property located at 885 Centre Street, Newton Centre, County of Middlesex, Commonwealth of Massachusetts.  The Trustees of Boston College, which is a Massachusetts nonprofit organization, owns and/or operates Boston College Law School or "BCLS" at 885

CENTRE STREET. Any events in this Complaint concerning BCLS occurred at or in connection with 885 CENTRE STREET.

23. The Defendant, Real Property Located in Charlestown, County of Suffolk, Commonwealth of Massachusetts ("40 WINTHROP STREET"), is real property located at 40 Winthrop Street, Charlestown, County of Suffolk, Commonwealth of Massachusetts.

24. The Defendant, Real Property 1 Located in Boston, County of Suffolk, Commonwealth of Massachusetts ("41 PHILLIPS STREET APARTMENT"), is real property located at 41 Phillips Street, Apartment 4, Boston, County of Suffolk, Commonwealth of Massachusetts.

25. The Defendant, Real Property 2 Located in Boston, County of Suffolk, Commonwealth of Massachusetts ("1 COURTHOUSE WAY"), is real property located at 1 Courthouse Way, Boston, County of Suffolk, Commonwealth of Massachusetts.

26. The Defendant, Real Property 3 Located in Boston, County of Suffolk, Commonwealth of Massachusetts ("3 PEMBERTON SQUARE"), is real property located at 3 Pemberton Square, Boston, County of Suffolk, Commonwealth of Massachusetts. 3 PEMBERTON SQUARE is next to the John Adams Courthouse ("John Adams Courthouse") at 1 Pemberton Square, Boston, County of Suffolk, Commonwealth of Massachusetts.

27. The Defendant, One Automobile with a Certain Massachusetts License Plate ("DURKIN CAR"), is personal property in the form of an automobile with a Commonwealth of Massachusetts license plate of "DURKIN."

28.   The Defendant, Real Property Located in Manchester, County of Essex, Commonwealth
of Massachusetts ("20 HARBOR STREET"), is real property located in the 20 Harbor
Street, Manchester, County of Essex, Commonwealth of Massachusetts.

29.   The Defendant, MassMail Email System of the Commonwealth of Massachusetts
("MASSMAIL"), was and/or is the official email system of the Commonwealth of
Massachusetts.  MASSMAIL had and/or has a domain name of "massmail.state.ma.us"
and/or "state.ma.us."  Each and every defendant named in the above-captioned action that
is and/or was an employee of the Commonwealth of Massachusetts has and/or had a
MASSMAIL account (altogether, the "MASSMAIL USERS").  Each of the MASSMAIL
USERS sent and/or received information using MASSMAIL that is relevant to and not
exempt from discovery in the above-captioned action within the meaning of the Federal
Rules of Evidence.*

30.   The Defendant, One or More Equitable Sharing Program Bank Accounts ("EQUITABLE
SHARING ACCOUNTS"), is or are bank accounts in which funds from the Equitable
Sharing Program are deposited and kept by law enforcement agencies of the
Commonwealth of Massachusetts.

31.   The Defendant, One or More Bank Accounts of the Obama Foundation ("OBAMA
FOUNDATION ACCOUNTS"), are one or more deposit accounts of the Obama
Foundation (the "Obama Foundation"), which is a non-profit corporation organized under
the laws of the State of Illinois.   The Obama Foundation is owned and/or operated in
whole or in part by the Defendant, Barack Obama and the Defendant, David Simas.

32.   The Defendant, One or More Bank Accounts of the Trustees of Boston College (the
"BOSTON COLLEGE BANK ACCOUNTS"), are one or more deposit accounts of the

Trustees of Boston College, which is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts.

33. The Defendant, Toyota Tacoma with a Massachusetts Plate (the "TACOMA"), is a Toyota Tacoma automobile with a Massachusetts license plate or previously with a Massachusetts license plate. The TACOMA was and/or is regularly parked at or around the 41 PHILLIPS STREET APARTMENT. The TACOMA is owned by the Defendant, Thomas Lampert.*

34. The Defendant, Maura Healey ("HEALEY"), is sued individually and in her official capacity as Attorney General of the Commonwealth of Massachusetts (the "OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH"). HEALEY maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts. HEALEY resides at 40 Winthrop Street, Charlestown, County of Suffolk, Commonwealth of Massachusetts. HEALEY is an attorney admitted to practice law in one or more jurisdictions.

35. The Defendant, Eric Neyman, ("NEYMAN"), is an associate justice of the Massachusetts Appeals Court. NEYMAN is sued individually and in his official capacity as Associate Justice of the Massachusetts Appeals Court. NEYMAN resides at 43 LISA LANE.* NEYMAN is an attorney admitted to practice law in one or more jurisdictions.

36. The Defendant, C. Jeffrey Kinder, ("KINDER"), is an associate justice of the Massachusetts Appeals Court. KINDER is sued individually and in his official capacity as Associate Justice of the Massachusetts Appeals Court. KINDER's residential address is unknown to the RELATOR. KINDER is an attorney admitted to practice law in one or more jurisdictions.

37. The Defendant, George O'Toole, Jr. ("O'TOOLE"), is a district judge on the United States District Court for the District of Massachusetts. O'TOOLE is sued in his official and individual capacities. O'TOOLE maintains a principal office at 1 COURTHOUSE WAY. O'TOOLE is an attorney admitted to practice law in one or more jurisdictions.

38. The Defendant, Patti Saris ("SARIS") is chief judge of the United States District Court for the District of Massachusetts. SARIS sued individually and in her official capacity as chief judge of the United States District Court for the District of Massachusetts. SARIS maintains a principal office at 1 COURTHOUSE WAY.

39. The Defendant, Leo Sorokin ("SOROKIN"), is a district judge on the United States District Court for the District of Massachusetts. SOROKIN is sued in his official and individual capacities. SOROKIN maintains a principal office at 1 COURTHOUSE WAY. SOROKIN is an attorney admitted to practice law in one or more jurisdictions. SOROKIN resides at 100 DAVIS AVENUE.

40. The Defendant, Robert Farrell ("FARRELL") is clerk of the United States District Court for the District of Massachusetts. FARRELL is sued individually and in his official capacity as clerk of the United States District Court for the District of Massachusetts. FARRELL maintains a principal office at 1 COURTHOUSE WAY.

41. The Defendant, Debra Squires-Lee ("SQUIRES-LEE") is sued individually and in her official capacity as justice of SUFFOLK SUPERIOR COURT. SQUIRES-LEE maintains a principal office at 3 PEMBERTON SQUARE. SQUIRES-LEE is an attorney admitted to practice law in one or more jurisdictions.

42. The Defendant, Linda Giles ("GILES") is sued individually and in her official capacity as justice of SUFFOLK SUPERIOR COURT. GILES maintains a principal office at 3

PEMBERTON SQUARE.  GILES is a friend of HEALEY and her spouse.  GILES is an attorney admitted to practice law in one or more jurisdictions.

43.    The Defendant, Amy Crafts ("CRAFTS"), is sued individually and in her official capacity as Assistant Attorney General of the Commonwealth.  CRAFTS maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts.  CRAFTS is an attorney admitted to practice law in one or more jurisdictions.

44.    The Defendant, Pierce O. Cray ("CRAY"), is sued individually and in his official capacity as Assistant Attorney General of the Commonwealth.  CRAY maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts.  CRAY is an attorney admitted to practice law in one or more jurisdictions.

45.    The Defendant, Gillian Feiner ("FEINER"), is sued individually and in her official capacity as Assistant Attorney General of the Commonwealth.  FEINER maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts.  FEINER is an attorney admitted to practice law in one or more jurisdictions.

46.    The Defendant, Dean Mazzone ("MAZZONE"), is sued individually and in his official capacity as Assistant Attorney General of the Commonwealth.  MAZZONE maintains a principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of Massachusetts.  MAZZONE is an attorney admitted to practice law in one or more jurisdictions.

47.    The Defendant, Howard Meshnick ("MESHNICK"), is sued individually and in his
       official capacity as Assistant Attorney General of the Commonwealth. MESHNICK
       maintains a principal office at One Ashburton Place, Boston, County of Suffolk,
       Commonwealth of Massachusetts. MESHNICK is an attorney admitted to practice law
       in one or more jurisdictions.

48.    The Defendant, Thomas J. Murphy ("MURPHY"), is sued individually and in his official
       capacity as State Police Officer of the Commonwealth. MURPHY's residential and
       government addresses are unknown to the RELATOR.

49.    The Defendant, James Sweeney ("SWEENEY"), is sued individually and in his official
       capacity as Assistant Attorney General of the Commonwealth. SWEENEY maintains a
       principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of
       Massachusetts. SWEENEY is an attorney admitted to practice law in one or more
       jurisdictions.

50.    The Defendant, Lorraine Tarrow ("TARROW"), is sued individually and in his official
       capacity as Assistant Attorney General of the Commonwealth. TARROW maintains a
       principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of
       Massachusetts. TARROW is an attorney admitted to practice law in one or more
       jurisdictions.

51.    The Defendant, Jeffrey Walker ("WALKER"), is sued individually and in his official
       capacity as Assistant Attorney General of the Commonwealth. WALKER maintains a
       principal office at One Ashburton Place, Boston, County of Suffolk, Commonwealth of
       Massachusetts. WALKER is an attorney admitted to practice law in one or more
       jurisdictions.

52.     The Defendant, Maris Abbene, ("ABBENE"), was and/or is an employee of Boston
        College Law School. ABBENE is sued individually. ABBENE maintains a principal
        office at 885 CENTRE STREET. ABBENE is an attorney admitted to practice law in
        one or more jurisdictions.

53.     The Defendant, Tyler Archer ("ARCHER"), is a former student at and graduate of
        Boston College Law School. ARCHER is sued individually. ARCHER's last known
        address is unknown to the RELATOR. ARCHER is an attorney admitted to practice law
        in one or more jurisdictions.*

54.     The Defendant, David Barron, ("BARRON"), is a judge on the United States Court of
        Appeals for the First Circuit. BARRON maintains a principal office at 1
        COURTHOUSE WAY. BARRON is sued in his individual capacity. BARRON's last
        known address is unknown to the RELATOR. BARRON is an attorney admitted to
        practice law in one or more jurisdictions.

55.     The Defendant, Judd Carhart, ("CARHART"), is a retired associate justice of the
        Massachusetts Appeals Court. CARHART is sued individually. CARHART's
        residential address is unknown to the RELATOR. CARHART was and/or is an attorney
        admitted to practice law in one or more jurisdictions.*

56.     The Defendant, R. Michael Cassidy, ("CASSIDY"), was and/or is an employee of Boston
        College Law School. CASSIDY is sued individually. CASSIDY maintains a principal
        office at 885 CENTRE STREET. CASSIDY is an attorney admitted to practice law in
        one or more jurisdictions.*

57.     The Defendant, Martha Coakley, ("COAKLEY"), is the former Attorney General of the
        Commonwealth. COAKLEY is sued individually. COAKLEY resides at 46 Coolidge

Road, Medford, County of Middlesex, Commonwealth of Massachusetts.  Coakley is an attorney admitted to practice law in one or more jurisdictions.*

58.    The Defendant, Kevin Curtin, ("CURTIN"), was and/or is an employee of Boston College Law School.  CURTIN was and/or is an assistant district attorney for Middlesex County, Massachusetts.  CURTIN is sued individually.  CURTIN maintains offices at 885 CENTRE STREET and 15 Commonwealth Avenue, Woburn, County of Middlesex, Commonwealth of Massachusetts.  CURTIN is an attorney admitted to practice law in one or more jurisdictions.*

59.    The Defendant, John Dawley ("DAWLEY"), was and/or is an assistant district attorney for Essex County, Massachusetts.  DAWLEY is an assistant attorney general of the Commonwealth.  DAWLEY is sued individually.  DAWLEY's last known address is unknown to the RELATOR.  DAWLEY is an attorney admitted to practice law in one or more jurisdictions.*

60.    The Defendant, Brian Durkin ("BRIAN DURKIN"), is a former student at and graduate of Boston College Law School.  BRIAN DURKIN is sued individually.  BRIAN DURKIN resides at 103 Marlborough Street, Apartment 6, Boston, County of Suffolk, Commonwealth of Massachusetts.  BRIAN DURKIN is an attorney admitted to practice law in one or more jurisdictions.*

61.    The Defendant, Thomas Durkin ("THOMAS DURKIN"), is a former student at and graduate of Boston College Law School.  THOMAS DURKIN is sued individually.  BRIAN DURKIN resides at 20 HARBOR STREET.  THOMAS DURKIN is an attorney admitted to practice law in one or more jurisdictions.*

62.     The Defendant, Michael Fatale ("FATALE"), was and/or is an employee of Boston

College Law School.  FATALE is sued individually.  At all times relevant to the above-

captioned action, FATALE was an employee of DOR.  FATALE is a former student at

and graduate of Boston College Law School.  FATALE resides at 14 Elmhurst Terrace,

Waltham, County of Middlesex, Commonwealth of Massachusetts.  FATALE is an

attorney admitted to practice law in one or more jurisdictions.*

63.     The Defendant, Joseph Herlihy ("JOSEPH HERLIHY"), was and/or is an employee of

Boston College Law School.  JOSEPH HERLIHY is sued individually.  HERLIHY

resides at 14 Elmhurst Terrace, Waltham, County of Middlesex, Commonwealth of

Massachusetts.  JOSEPH HERLIHY is an attorney admitted to practice law in one or

more jurisdictions.*

64.     The Defendant, Sarah Herlihy ("SARAH HERLIHY"), is a former student at and

graduate of Boston College Law School.  SARAH HERLIHY is sued individually.

SARAH HERLIHY's last known address is unknown to the RELATOR.  SARAH

HERLIHY is an attorney admitted to practice law in one or more jurisdictions.*

65.     The Defendant, Gary Katzmann ("Katzmann"), is a judge on the U.S. Court of

International Trade.  Katzmann is sued individually.  Katzmann maintains a principal

office at the U.S. Court of International Trade in New York, New York.  Katzmann is an

attorney admitted to practice law in one or more jurisdictions.

66.     The Defendant, Elisabeth Keller ("KELLER"), was and/or is an employee of Boston

College Law School.  KELLER is sued individually.  KELLER resides at 29 Shaw Road,

Chestnut Hill, County of Norfolk, Commonwealth of Massachusetts.*

67.     The Defendant, Thomas Lampert ("LAMPERT"), is a former student at and graduate of Boston College Law School. LAMPERT resides at the 41 PHILLIPS STREET APARTMENT. LAMPERT owns the TACOMA. LAMPERT is an attorney admitted to practice law in one or more jurisdictions.*

68.     The Defendant, David Lowy ("LOWY"), is a justice of the Supreme Judicial Court of the Commonwealth of Massachusetts. LOWY's residential address is unknown to the RELATOR. LOWY is an attorney admitted to practice law in one or more jurisdictions.

69.     The Defendant, Loretta Lynch ("LYNCH"), is the former attorney general of the United States. LYNCH is sued individually. LYNCH's residential address is unknown to the RELATOR. LYNCH is an attorney admitted to practice law in one or more jurisdictions.

70.     The Defendant, David Mackey ("MACKEY"), was and/or is an employee of Boston College Law School. MACKEY is sued individually. MACKEY's residential address is unknown to the RELATOR. MACKEY is an attorney admitted to practice law in one or more jurisdictions. MACKEY is a partner in the Boston, Massachusetts office of the law firm, Anderson & Kreiger LLP.

71.     The Defendant, Thomas Maffei ("MAFFEI"), was and/or is an employee of Boston College Law School. MAFFEI is sued individually. MAFFEI is a former student at and graduate of Boston College Law School. MAFFEI's residential address is unknown to the RELATOR. MAFFEI is an attorney admitted to practice law in one or more jurisdictions.

72.     The Defendant, Justin Maloney ("MALONEY"), is a former student at and graduate of Boston College Law School. MALONEY's residential address is unknown to the

RELATOR. MALONEY is an attorney admitted to practice law in one or more jurisdictions.

73.    The Defendant, Barack Obama, ("OBAMA"), is the former president of the United States. OBAMA resides at 2446 BELMONT ROAD. OBAMA is a graduate of Harvard Law School. OBAMA is also known as Barry Soetoro and/or another alias.*

74.    The Defendant, George O'Toole, Jr. ("O'TOOLE"), is a senior district judge on the United States District Court for the District of Massachusetts. O'TOOLE is sued individually. O'TOOLE's residential address is unknown to the RELATOR. O'TOOLE is an attorney admitted to practice law in one or more jurisdictions. O'TOOLE was the district judge in a case in which the RELATOR was a party (the "First Federal Action").

75.    The Defendant, Carmen Ortiz ("ORTIZ"), is the former United States attorney for the District of Massachusetts. ORTIZ is sued individually. ORTIZ residential address is unknown to the RELATOR. ORTIZ is an attorney admitted to practice law in one or more jurisdictions.

76.    The Defendant, Vincent Rougeau. ("ROUGEAU"), is the dean of Boston College Law School. ROUGEAU is sued individually. ROUGEAU resides at 101 ASH STREET.

77.    The Defendant, Donald Savery ("SAVERY"), was and/or is an employee of Boston College Law School. SAVERY is sued individually. SAVERY is a former student at and graduate of Boston College Law School. SAVERY's residential address is unknown to the RELATOR. SAVERY is an attorney admitted to practice law in one or more jurisdictions.

78.    The Defendant, David Simas ("SIMAS"), is a former presidential employee of OBAMA and currently is the Chief Executive Officer of the Obama Foundation. SIMAS is sued

individually.  SIMAS is a former student at and graduate of Boston College Law School. SIMAS's residential address is unknown to the RELATOR.

79.     The Defendant, Robert Ullmann ("ULLMANN"), was and/or is an employee of Boston College Law School.  ULLMANN is sued individually.  ULLMANN is justice of SUFFOLK SUPERIOR COURT.  SAVERY's residential address is unknown to the RELATOR.  ULLMANN is an attorney admitted to practice law in one or more jurisdictions.  ULLMANN is a former assistant United States Attorney who served with and under ORTIZ.

80.     The Defendant, John Verner ("VERNER"), was and/or is an employee of Boston College Law School.  VERNER is sued individually.  VERNER is a former assistant attorney general of the Commonwealth.  VERNER's residential address is unknown to the RELATOR.  VERNER is an attorney admitted to practice law in one or more jurisdictions.

81.     The Defendant, Gabrielle Wolohojian ("WOLOHOJIAN"), is a justice of the Massachusetts Appeals Court.  WOLOHOJIAN is sued individually.  WOLOHOJIAN resides at 40 WINTHROP STREET.  WOLOHOJIAN is married to HEALEY. WOLOHOJIAN is an attorney admitted to practice law in one or more jurisdictions.

82.     The Defendant, Christopher Harding (the "Commissioner") is sued in his official capacity as Commissioner of the Massachusetts Department of Revenue.  The Commissioner maintains a principal office at 100 Cambridge Street, Boston, County of Suffolk, Commonwealth of Massachusetts.

83.     The Defendant, United States, is the federal government of the United States of America.

84.    The Defendant, U.S. Department of Justice, is a federal law enforcement agency having its principal office at 950 Pennsylvania Avenue, N.W., Washington, District of Columbia.

85.    The Defendant, United States District Court for the District of Massachusetts, is the federal district court for the district of Massachusetts having its principal office at 1 COURTHOUSE WAY.

86.    The Defendant, Commonwealth of Massachusetts (the "Commonwealth"), is the sovereign state of Massachusetts.

87.    The Defendant, Supreme Judicial Court for the Commonwealth, is the highest court of the Commonwealth having its principal office at 3 PEMBERTON SQUARE.

88.    The Defendant, Suffolk Superior Court ("SUFFOLK SUPERIOR COURT"), is a trial court of the Commonwealth having its principal office at 3 PEMBERTON SQUARE.

89.    The Defendant, State of Colorado ("Colorado"), is the sovereign state of Colorado.

90.    The Defendant, American Bar Association ("ABA"), is the national association for lawyers and is the world's largest professional association.  It is organized as a State of Illinois not-for-profit corporation with its principal place of business in Chicago, Illinois. The ABA is headquartered at 321 North Clark Street, Chicago, Illinois.  The ABA was and/or is subject to one or more federal court orders in connection with one or more alleged violations of federal antitrust laws.  The ABA promulgates and enforces standards for law schools throughout the United States.  The ABA directs its activities to all 50 states of the United States.*

91.    The Defendant, Law School Admissions Council ("LSAC"), is a State of Delaware not-for-profit corporation headquartered at 662 Penn Street, Newtown, Pennsylvania.  LSAC

provides a number of services to its member law schools and to persons seeking admission to law school, including the administration of the LSAT, which is an examination related to applications for post-secondary education purposes within the meaning of 42 U.S.C. § 12189 and the Department of Justice's implementing regulation, 28 C.F.R. § 36.309. Among other things, LSAC administers, manages, and proctors the LSAT multiple times each year at approximately 1,400 law schools, universities, and other venues across the United States, organizes and holds open invitation forums at hotels and universities for prospective law students, and conducts educational conferences at hotels and universities for law school professionals and prelaw advisors. LSAC directs its activities to all 50 states of the United States.

92.  The Defendant, Trustees of Boston College ("TRUSTEES OF BOSTON COLLEGE" or "BOSTON COLLEGE"), is a not-for-profit corporation or organization pursuant to the laws of the Commonwealth of Massachusetts. BOSTON COLLEGE owns and/or operates 885 CENTRE STREET. BOSTON COLLEGE owns and/or operates a college basketball team that rigged games during one or more college basketball seasons in the late 1970s or early 1980s. BOSTON COLLEGE owns and/or operates Boston College Law School ("BCLS") at 885 CENTRE STREET. BCLS is an ABA-approved law school. Through LSAC and its own internal practices, BCLS solicits and accepts applications from law school applicants in all 50 states of the United States. BOSTON COLLEGE directs its activities to all 50 states of the United States.

93.  The Defendant, Cornell University, is a not-for-profit corporation or organization pursuant to the laws of the State of New York. Cornell University also owns real property and/or transacts business in the State of New Hampshire by and through the

Shoals Marine Laboratory, Morse Hall, Suite 113, 8 College Road, Durham, New Hampshire. Cornell University owns and/or operates Cornell Law School, an ABA-approved law school, in Ithaca, New York. Through LSAC and its own internal practices, Cornell Law School solicits and accepts applications from law school applicants in all 50 states of the United States. Cornell University directs its activities to all 50 states of the United States.

94. The Defendant, Wilmer Cutler Pickering Hale and Dorr LLP ("WILMERHALE") is a limited liability partnership with offices in Washington, District of Columbia, Denver, Colorado, and Boston, Massachusetts.

## JURISDICTION AND VENUE

95. This Court has jurisdiction pursuant to 18 U.S.C. § 1964(a), 31 U.S.C. § 3732(b), and 28 U.S.C. § 1331.

96. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

97. Venue is proper in this Court pursuant to 18 U.S.C § 1965(a), 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391.

## IMPORTATION OF MARIJUANA FROM COLORADO TO MASSACHUSETTS

98. Article I § 8 of the U.S. Constitution holds in part that "[t]he Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, ... To regulate Commerce ... among the several States, ... [and] To establish Post Offices and post Roads."

99. Article IV § 1 of the U.S. Constitution holds that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State; and the Congress may by general Laws prescribe the Manner in which such Acts, Records,

and Proceedings shall be proved, and the Effect thereof" (the "Full Faith and Credit Clause").

100. Article VI § 2 of the U.S. Constitution holds that

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

101. The Fourth Amendment to the U.S. Constitution provides that

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

102. The Fifth Amendment to the U.S. Constitution holds in part that "[n]o person shall ... be subject for the same offence to be twice put in jeopardy of life or limb" (the "Double Jeopardy Clause").

103. The Tenth Amendment to the U.S. Constitution holds that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

104. Section 16(1) of Article XVIII of the Colorado Constitution provides that

> In the interest of the health and public safety of our citizenry, the people of the State of Colorado further find and declare that marijuana should be regulated in a manner similar to alcohol so that
>
> (a) In the interest of the efficient use of law enforcement resources, enhancing revenue for public purposes, and individual freedom, the people of the state of Colorado find and declare that the use of marijuana should

be legal for persons twenty-one years of age or older and taxed in a manner similar to alcohol.

(b) In the interest of the health and public safety of our citizenry, the people of the state of Colorado further find and declare that marijuana should be regulated in a manner similar to alcohol so that:

> (I) Individuals will have to show proof of age before purchasing marijuana;

> (II) Selling, distributing, or transferring marijuana to minors and other individuals under the age of twenty-one shall remain illegal;

> (III) Driving under the influence of marijuana shall remain illegal;

> (IV) Legitimate, taxpaying business people, and not criminal actors, will conduct sales of marijuana; and

> (V) Marijuana sold in this state will be labeled and subject to additional regulations to ensure that consumers are informed and protected.

(c) In the interest of enacting rational policies for the treatment of all variations of the cannabis plant, the people of Colorado further find and declare that industrial hemp should be regulated separately from strains of cannabis with higher delta-9 tetrahydrocannabinol (THC) concentrations.

(d) The people of the state of Colorado further find and declare that it is necessary to ensure consistency and fairness in the application of this section throughout the state and that, therefore, the matters addressed by this section are, except as specified herein, matters of statewide concern.

105. Section 16(3) of Article XVIII of the Colorado Constitution provides:

> Notwithstanding any other provision of law, the following acts are not unlawful and shall not be an offense under Colorado law or the law of any locality within Colorado or be a basis for seizure or forfeiture of assets under Colorado law for persons twenty-one years of age or older:

> (a) Possessing, using, displaying, purchasing, or transporting marijuana accessories or one ounce or less of marijuana.

> (b) Possessing, growing, processing, or transporting no more than six marijuana plants, with three or fewer being mature, flowering plants, and possession of the marijuana produced by the plants on the premises where

the plants were grown, provided that the growing takes place in an enclosed, locked space, is not conducted openly or publicly, and is not made available for sale.

(c) Transfer of one ounce or less of marijuana without remuneration to a person who is twenty-one years of age or older.

(d) Consumption of marijuana, provided that nothing in this section shall permit consumption that is conducted openly and publicly or in a manner that endangers others.

(e) Assisting another person who is twenty-one years of age or older in any of the acts described in paragraphs (a) through (d) of this subsection.

106.    The RELATOR, as a natural person, is twenty-one years of age or older.

107.    The RELATOR, as a natural person, has never been publicly charged in a court of law for a criminal offense by the United States or any state of the United States at the time of the filing of the above-captioned proceeding.

108.    According to a press release, on or about January 25, 2018, the United States District Court for the District of Colorado sentenced an individual (the "Arvada, Colorado Man") to federal prison for one year and one day for possession of marijuana with intent to distribute after the Arvada, Colorado Man admitted in stipulated facts contained in a plea agreement that he mailed multiple packages from Colorado containing marijuana through the United States Postal Service. "Arvada Man Sentenced to Federal Prison for Mailing Marijuana," U.S. Attorney's Office, District of Colorado, available at https://www.justice.gov/usao-co/pr/arvada-man-sentenced-federal-prison-mailing-marijuana.

109.    According to a press release, the Arvada, Colorado Man was investigated by the United States Postal Inspection Service, the Police Department of Arvada, Colorado, and the West Metro Drug Task Force. Id.  In the same statement regarding the sentencing of the

Arvada, Colorado Man released on or about February 8, 2018, Dana Carter, Inspector in Charge of the United States Postal Service, Denver Division, stated that "**U.S. Postal Inspectors continue to aggressively target individuals who use the postal service to distribute controlled substances.**" (emphasis added). Id.

110.   Prior to June 27, 2014, the RELATOR acquired more than forty marijuana tax stamps (the "Tax Stamps") at a price of $3.50 each pursuant to Mass. Gen. Laws. ch. 64K §§ 1-14 (the "Massachusetts Controlled Substances Tax" or the "CST") from the Massachusetts Department of Revenue.

111.   The CST imposes a penalty of $3.50 per gram of marijuana payable by purchase of marijuana tax stamps from the Commissioner of the Massachusetts Department of Revenue.

112.   As a matter of law, violation of the CST is penalized by imposing the original tax stamp rate and adding a 100% nonpayment penalty.

113.   Under the economic laws of supply and demand, voluntary compliance with the CST by any person significantly increases the price of marijuana and controlled substances like heroin, thereby destroying demand, by significantly raising the price for the marijuana or controlled substance in question.

114.   Under the economic laws of supply and demand, post-arrest assessment of the CST against any person significantly increases the price of marijuana and controlled substances like heroin, thereby destroying demand, by significantly raising the price for the marijuana or controlled substance in question.

115.  On or about January 16, 2018, the RELATOR intends to complete a purchase of 28 or fewer grams of marijuana from a recreational marijuana dispensary duly licensed by the State of Colorado (altogether, "Purchase #1").

116.  On or about January 16, 2018, the RELATOR intends to purchase a United States Postal Service mailing stamp for the purpose of mailing Purchase #1 with Tax Stamps affixed pursuant to the CST from Colorado to one or more persons aged 21 years or older in Massachusetts for remuneration.

117.  On or about January 16, 2018, the RELATOR intends to complete a purchase of 28 or fewer grams of marijuana from a recreational marijuana dispensary duly licensed by the State of Colorado (altogether, "Purchase #2").

118.  On or about January 16, 2018, the RELATOR intends to purchase a United States Postal Service mailing stamp for the purpose of mailing Purchase #2 with Tax Stamps affixed pursuant to the CST from Colorado to one or more persons aged 21 years or older in Massachusetts for remuneration.

119.  The RELATOR does not intend to have more than 28 grams of marijuana in his possession in the State of Colorado at any time while in possession of Purchase #1.

120.  The aggregate amount of marijuana from the mailing Purchase #1 and mailing Purchase #2 (the "Mailing Transactions") exceeds forty grams.

121.  The RELATOR cannot carry out the Mailing Transactions but for the imminent threat of criminal investigation and/or prosecution pursuant to inapplicable state and federal statutes.

122.  The RELATOR cannot carry out the Mailing Transactions so as to import more than forty grams of marijuana into Massachusetts but for the imminent threat of criminal

investigation and/or prosecution by the State of Colorado, the Commonwealth of

Massachusetts, and the United States.

123.    The State of Colorado would gain new revenue for the Mailing Transactions according to

its laws.

124.    The Commonwealth of Massachusetts would gain new revenue for the Mailing

Transactions according to its laws.

125.    The United States Postal Service would gain new revenue for the Mailing Transactions

according to the United States Postal Service's own mailing regulations.

126.    In each of the latest two full years for which financial results are available, the United

States Postal Service has reported losses in excess of over $1 billion.

127.    The RELATOR, for his actions pursuant to Section 16(3) of Article XVIII of the

Colorado Constitution and/or the CST, was, is, and/or will be under investigation by the

State of Colorado for potential criminal prosecution.

128.    The Colorado Constitution expressly exempts from criminal proceeding and asset

forfeiture by Colorado or any locality within Colorado the act of "[a]ssisting another

person who is twenty-one years of age or older" in "[p]ossessing, using, displaying,

purchasing, or transporting ... one ounce or less of marijuana."

129.    The act of "[a]ssisting another person who is twenty-one years of age or older" in

"[p]ossessing, using, displaying, purchasing, or transporting ... one ounce or less of

marijuana" is the function of a broker.  See Oxford English Dictionary (Defining

"broker" as "[a] person who buys and sells goods or assets for others.").

130.    Well-established canons of statutory interpretation hold that a) a lawmaking authority is

presumed to act intentionally and purposely when it includes language in one section or

subsection but omits the same language in another; and b) a particular section of a statute should not be inconsistent with the rest of the statute.

131.   In the Colorado Constitution, the words "without remuneration" were included as to the "transfer of one ounce or less of marijuana" but not as to "[a]ssisting another person who is twenty-one years of age or older" in "[p]ossessing, using, displaying, purchasing, or transporting … one ounce or less of marijuana."

132.   Colorado states in writing on its official website – https://www.colorado.gov – that "[o]nly licensed retailers can sell marijuana products" and that "[a]dults over 21 can give up to 1 ounce of marijuana to another adult 21 or older, but can't sell marijuana."

133.   C.R.S. 18-18-406(2)(b)(I) provides that "[i]t is unlawful for a person to knowingly dispense, sell, distribute, or possess with intent to manufacture, dispense, sell, or distribute marijuana or marijuana concentrate; or attempt, induce, attempt to induce, or conspire with one or more other persons, to dispense, sell, distribute, or possess with intent to manufacture, dispense, sell, or distribute marijuana or marijuana concentrate."

134.   C.R.S. 18-18-406(2)(b)(III) provides that "[a] person who violates any of the provisions of subparagraph (I) of this paragraph (b) commits … [a] level 1 drug misdemeanor if the amount is not more than four ounces of marijuana or not more than two ounces of marijuana concentrate."

135.   C.R.S. 18-18-406(5.5)(a) provides that "[i]t is unlawful for a person to transfer marijuana or marijuana concentrate at no cost to a person if the transfer is in any way related to remuneration for any other service or product."

136.   C.R.S. 18-18-406(5.5)(b) provides that "[a] violation of this subsection (5.5) is a level 1 drug misdemeanor."

137. C.R.S. 18-18-406(2)(b) is unconstitutional on its face and/or as applied to the RELATOR for the conduct alleged herein, where Section 16(3) of Article XVIII of the Colorado Constitution exempts "[a]ssisting another person who is twenty-one years of age or older" with or without remuneration in "[p]ossessing, using, displaying, purchasing, or transporting ... one ounce or less of marijuana" from any criminal or asset forfeiture proceeding brought by Colorado.

138. C.R.S. 18-18-406(5.5) is unconstitutional on its face and/or as applied to the RELATOR for the conduct alleged herein, because Section 16(3) of Article XVIII of the Colorado Constitution exempts "[a]ssisting another person who is twenty-one years of age or older" with or without remuneration in "[p]ossessing, using, displaying, purchasing, or transporting ... one ounce or less of marijuana" from any criminal or asset forfeiture proceeding brought by Colorado.

139. The RELATOR, for his actions pursuant to Section 16(3) of Article XVIII of the Colorado Constitution and/or the CST was, is, and/or will be under investigation by the Commonwealth of Massachusetts for potential criminal prosecution.

140. The "transfer of ... marijuana" is the function of a dealer, where the dealer actually causes marijuana in his or her possession to be conveyed to the possession of another person. See Mass. Gen. Laws ch. 64K § 1 (Defining "Dealer" as "a person who, in violation of Massachusetts law, ... manufactures, produces, ships, transports, or imports into the commonwealth or in any manner acquires or possesses more than forty grams of marihuana" and defining "Marihuana" as "marihuana, whether real or counterfeit, as defined in section one of chapter ninety-four C, that is held, possessed, transported, transferred, sold or offered for sale in violation of Massachusetts law."

141. In addition to the CST, Chapter 94C of the General Laws of the Commonwealth of
Massachusetts provides for criminal penalties for offenses involving marijuana in
Massachusetts.

142. Mass. Gen. Laws ch. 94C § 32C(a) provides that "[a]ny person who knowingly or
intentionally manufactures, distributes, dispenses or cultivates, or possesses with intent to
manufacture, distribute, dispense or cultivate a controlled substance in Class D of section
thirty-one shall be imprisoned in a jail or house of correction for not more than two years
or by a fine of not less than five hundred nor more than five thousand dollars, or both
such fine and imprisonment."

143. Mass. Gen. Laws ch. 94C § 31 defines marijuana as a Class D substance.

144. It is beyond dispute that the CST implicates the Double Jeopardy Clause of the Fifth
Amendment to the U.S. Constitution. See Dep't of Revenue v. Kurth Ranch, 511 U.S.
767, (1994) ("Taken as a whole, this drug tax is a concoction of anomalies, too far
removed in crucial respects from a standard tax assessment to escape characterization as
punishment for the purpose of double jeopardy analysis."); Comm'r of Revenue v.
Mullins, 428 Mass. 406, 412 (1998) (applying Kurth Ranch in finding "taxes assessed
under the statute be considered punishment for double jeopardy purposes" because "[t]he
Fifth Amendment does not prevent imposition of the tax; it merely restricts the ability of
the Commonwealth to assess the tax against those who have suffered criminal penalties
for the same possession of marihuana or controlled substances.").

145. The Commonwealth is without authority to initiate a criminal proceeding against the
RELATOR as to any act alleged herein or enumerated in the CST because the

RELATOR is in voluntary compliance with the CST, which implicates the Double Jeopardy Clause.

146.   The Commonwealth of Massachusetts, by and through its attorneys, has represented in writing and in court proceedings that voluntary compliance with the CST does not implicate the Double Jeopardy Clause.

147.   Monies received by the Commonwealth of Massachusetts pursuant to the CST are deposited in Massachusetts' general fund.

148.   The RELATOR, for his actions pursuant to Section 16(3) of Article XVIII of the Colorado Constitution and/or the CST, was, is, and/or will be under investigation by the United States for potential criminal prosecution.

149.   21 U.S.C. § 802(16) defines "marihuana" as "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination."

150.   21 U.S.C. § 841(a)(1) provides that "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

151.   21 U.S.C. § 841(b)(1)(D) provides that "[i]n the case of less than 50 kilograms of marihuana, except in the case of 50 or more marihuana plants regardless of weight, 10

kilograms of hashish, or one kilogram of hashish oil, such person shall, except as

provided in paragraphs (4) and (5) of this subsection, be sentenced to a term of

imprisonment of not more than 5 years, a fine not to exceed the greater of that authorized

in accordance with the provisions of title 18 or $250,000 if the defendant is an individual

or $1,000,000 if the defendant is other than an individual, or both."

152.   21 U.S.C. § 844(a) holds that "[i]t shall be unlawful for any person knowingly or

intentionally to possess a controlled substance unless such substance was obtained

directly, or pursuant to a valid prescription or order, from a practitioner, while acting in

the course of his professional practice, or except as otherwise authorized by this

subchapter or subchapter II."

153.   In Gonzales v. Raich, 545 U.S. 1, 8 (2005), the United States Supreme Court found that

"we have never required Congress to make **particularized findings** in order to legislate

… **absent a special concern** such as the protection of free speech." (emphasis added).

154.   The Fifth Amendment protection against being "twice put in jeopardy of life or limb" for

the "same offense" is "a special concern such as the protection of free speech." See id.

155.   There is no particularized finding in the federal Controlled Substances Act (the

"Controlled Substances Act," or 21 U.S.C. §§ 801 *et seq.*) as to the regulation of

marijuana with state tax stamps affixed where such state tax stamps implicate the Double

Jeopardy Clause.

156.   There is nothing in the legislative history of the Controlled Substances Act that

demonstrates that Congress intended to regulate or prohibit marijuana with state tax

stamps implicating the Double Jeopardy Clause.

157. Congress has not yet regulated marijuana with tax stamps affixed implicating the Double Jeopardy Clause, but under <u>Raich</u>, Congress has the authority to do so if it makes a particularized finding or findings.  See <u>id.</u>

158. As a matter of law, the Controlled Substances Act, as currently enacted, does not apply to marijuana with tax stamps affixed pursuant to the CST so long as the dealer remains in voluntary compliance with the CST.[4]

159. Under the Controlled Substances Act, the United States does not have authority to initiate a criminal proceeding against the RELATOR for any act taken pursuant to the CST.[5]

160. The United States, by and through its attorneys, has made statements of law in pleadings filed in the United States District Court for the District of Massachusetts that contradict the statements of law made by the RELATOR herein.

161. The Commonwealth of Massachusetts, by and through its attorneys, has made statements of law in pleadings filed in the United States District Court for the District of Massachusetts that contradict the statements of law made by the RELATOR herein.

162. In or about February 2015, the Office of the U.S. Attorney for the District of Massachusetts, which was run by ORTIZ at the time, stated or suggested in writing in a court pleading in the United States District Court for the District of Massachusetts that an

---

[4] To the extent Congress has power under Article I of the U.S. Constitution to regulate marijuana with state tax stamps affixed that implicate the Double Jeopardy Clause, Congress is required to do so with particularity – that is, to specifically enumerate in a duly enacted federal law that marijuana with state tax stamps implicating the Double Jeopardy Clause is subject to regulation. See <u>Gonzales v. Raich</u>, 545 U.S. at 8.
[5] It should be noted that the distribution of marijuana with tax stamps affixed pursuant to the CST to a person in the District of Colorado or to a minor in either the Districts of Colorado or Massachusetts are not acts taken pursuant to the CST, and accordingly, each of the foregoing would be subject to investigation and/or prosecution under the relevant provisions of the Controlled Substances Act as well as Colorado and Massachusetts law.

individual in voluntary compliance with the CST could be prosecuted under the Controlled Substances Act.

163.   In or about February 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, which was run by HEALEY at the time, stated or suggested in writing in a court pleading in the United States District Court for the District of Massachusetts that an individual in voluntary compliance with the CST could be prosecuted under the Massachusetts Controlled Substances Act.

## THE LAW SCHOOL ADMISSIONS TEST

164.   LSAC administers the Law School Admissions Test ("LSAT") LSAT to approximately 150,000 people annually. Applicants to all ABA-approved law schools are required to take the LSAT in order to be eligible for admission to law school.

165.   LSAC administers the LSAT four times a year at approximately 650 test centers throughout the United States at a base cost of approximately $160 per applicant. Test centers include, among others, universities and law schools, and many examinees travel across state lines to take the test.

166.   The LSAT is a half-day standardized test consisting of five 35-minute sections of multiple-choice questions, four of which are scored, with a 35-minute unscored writing sample also administered.

167.   The RELATOR paid the registration fee for one or more LSAT examinations in 2014 and/or 2015.

168.   LSAC also offers a "Credential Assembly Service," in which applicants to law school upload transcripts, letters of recommendation, evaluations, and other application

materials. LSAC then disseminates the application materials, along with an applicant's LSAT score report, to law schools.

169.    The RELATOR paid one or more fees for the Credential Assembly Service in 2014, 2015, 2017, and/or 2018.

170.    Nearly all ABA-approved law schools and many other law schools require the use of this service for law school applicants.

171.    LSAC charges each of the 84,000 annual applicants a base cost of approximately $155 to participate in the Credential Assembly Service.

172.    LSAC makes candidates' law school application credentials available to law schools through its Candidate Referral Service.

173.    LSAC organizes and hosts open invitation forums at hotels and universities nationwide for nearly 10,000 prospective law students annually to meet with representatives of over 200 LSAC-member law schools to learn about LSAC and the LSAT.

174.    LSAC organizes and hosts educational conferences for law school administrators and professionals and for prelaw advisors to learn about LSAC and the law school admissions process.

175.    The RELATOR paid fees in excess of $500 in connection with use of the official website of LSAC.

## BOSTON COLLEGE LAW SCHOOL TUITION RATES

176.    The tuition rate at Boston College Law School was approximately $1,500 in 1966.

177.    The tuition rate at Boston College Law School was approximately $2,650 in 1974.

178.    The tuition rate at Boston College Law School was approximately $2,800 in 1975.

179.    The tuition rate at Boston College Law School was approximately $2,950 in 1976.

180. The tuition rate at Boston College Law School was approximately $3,200 in 1977.

181. The tuition rate at Boston College Law School was approximately $3,500 in 1978.

182. The tuition rate at Boston College Law School was approximately $3,810 in 1979.

183. The tuition rate at Boston College Law School was approximately $4,200 in 1980.

184. The tuition rate at Boston College Law School was approximately $4,900 in 1981.

185. The tuition rate at Boston College Law School was approximately $5,625 in 1982.

186. The tuition rate at Boston College Law School was approximately $6,575 in 1983.

187. The tuition rate at Boston College Law School was approximately $7,450 in 1984.

188. The tuition rate at Boston College Law School was approximately $8,200 in 1985.

189. The tuition rate at Boston College Law School was approximately $8,920 in 1986.

190. The tuition rate at Boston College Law School was approximately $9,820 in 1987.

191. The tuition rate at Boston College Law School was approximately $9,820 in 1987.

192. The tuition rate at Boston College Law School was approximately $10,560 in 1988.

193. The tuition rate at Boston College Law School was approximately $11,460 in 1989.

194. The tuition rate at Boston College Law School was approximately $12,510 in 1990.

195. The tuition rate at Boston College Law School was approximately $13,670 in 1991.

196. The tuition rate at Boston College Law School was approximately $15,570 in 1992.

197. The tuition rate at Boston College Law School was approximately $16,590 in 1993.

198. The tuition rate at Boston College Law School was approximately $17,720 in 1994.

199. The tuition rate at Boston College Law School was approximately $18,940 in 1995.

200. The tuition rate at Boston College Law School was approximately $20,180 in 1996.

201. The tuition rate at Boston College Law School was approximately $21,230 in 1997.

202. The tuition rate at Boston College Law School was approximately $22,300 in 1998.

203.   The tuition rate at Boston College Law School was approximately $23,420 in 1999.

204.   The tuition rate at Boston College Law School was approximately $24,480 in 2000.

205.   The tuition rate at Boston College Law School was approximately $25,790 in 2001.

206.   The tuition rate at Boston College Law School was approximately $27,080 in 2002.

207.   The tuition rate at Boston College Law School was approximately $28,440 in 2003.

208.   The tuition rate at Boston College Law School was approximately $29,720 in 2004.

209.   The tuition rate at Boston College Law School was approximately $31,520 in 2005.

210.   The tuition rate at Boston College Law School was approximately $33,110 in 2006.

211.   The tuition rate at Boston College Law School was approximately $36,510 in 2007.

212.   The tuition rate at Boston College Law School was approximately $38,340 in 2008.

213.   The tuition rate at Boston College Law School was approximately $39,490 in 2009.

214.   The tuition rate at Boston College Law School was approximately $40,770 in 2010.

215.   The tuition rate at Boston College Law School was approximately $41,590 in 2011.

216.   The tuition rate at Boston College Law School was approximately $43,170 in 2012.

217.   The tuition rate at Boston College Law School was approximately $44,860 in 2013.

218.   The tuition rate at Boston College Law School was approximately $46,790 in 2014.

219.   The tuition rate at Boston College Law School was approximately $48,670 in 2015.

220.   The tuition rate at Boston College Law School was approximately $50,620 in 2016.

221.   The tuition rate at Boston College Law School was approximately $52,640 in 2017.

222.   The tuition rate at Boston College Law School was approximately $54,750 in 2018.

223.   The tuition rate at Boston College Law School adjusted for inflation in 2016 dollars
increased by approximately 332% from 1966 to 2016.

224.   The tuition rate at Boston College Law School adjusted for inflation in 2016 dollars increased by approximately 307% from 1976 to 2016.

225.   The tuition rate at Boston College Law School adjusted for inflation in 2016 dollars increased by approximately 160% from 1986 to 2016.

226.   The tuition rate at Boston College Law School adjusted for inflation in 2016 dollars increased by approximately 64% from 1996 to 2016.

227.   The tuition rate at Boston College Law School adjusted for inflation in 2016 dollars increased by approximately 28% from 2006 to 2016.

### CORNELL LAW SCHOOL TUITION RATES

228.   The tuition rate at Cornell Law School was approximately $22,100 in 1996.

229.   The tuition rate at Cornell Law School was approximately $23,100 in 1997.

230.   The tuition rate at Cornell Law School was approximately $24,100 in 1998.

231.   The tuition rate at Cornell Law School was approximately $25,548 in 1999.

232.   The tuition rate at Cornell Law School was approximately $27,350 in 2000.

233.   The tuition rate at Cornell Law School was approximately $29,250 in 2001.

234.   The tuition rate at Cornell Law School was approximately $31,250 in 2002.

235.   The tuition rate at Cornell Law School was approximately $32,970 in 2003.

236.   The tuition rate at Cornell Law School was approximately $35,342 in 2004.

237.   The tuition rate at Cornell Law School was approximately $37,812 in 2005.

238.   The tuition rate at Cornell Law School was approximately $40,648 in 2006.

239.   The tuition rate at Cornell Law School was approximately $43,688 in 2007.

240.   The tuition rate at Cornell Law School was approximately $45,803 in 2008.

241.   The tuition rate at Cornell Law School was approximately $49,020 in 2009.

242.   The tuition rate at Cornell Law School was approximately $51,150 in 2010.

243.   The tuition rate at Cornell Law School was approximately $53,226 in 2011.

244.   The tuition rate at Cornell Law School was approximately $55,301 in 2012.

245.   The tuition rate at Cornell Law School was approximately $57,351 in 2013.

246.   The tuition rate at Cornell Law School was approximately $59,360 in 2014.

247.   The tuition rate at Cornell Law School was approximately $59,900 in 2015.

248.   The tuition rate at Cornell Law School was approximately $61,400 in 2016.

249.   The tuition rate at Cornell Law School was approximately $63,342 in 2017.

250.   The tuition rate at Cornell Law School was approximately $65,456 in 2018.

251.   The tuition rate at Cornell Law School adjusted for inflation in 2016 dollars increased by approximately 64% from 1996 to 2016.

252.   The tuition rate at Cornell Law School adjusted for inflation in 2016 dollars increased by approximately 28% from 2006 to 2016.

## ANTITRUST COMBINATION OR CONSPIRACY

253.   The deans of ABA-approved law schools send and receive messages to each other on a group list (the "Deans' LISTSERV").

254.   The Deans' LISTSERV was and/or is used to communicate law school tuition rates by deans from ABA-approved law schools.*

255.   The Deans' LISTSERV was and/or is used to communicate law school tuition rates by the deans at BCLS and Cornell Law School during the time periods relevant to the above-captioned proceeding.*

256.   Electronic mail or another method of electronic communication was and/or is used to communicate law school tuition rates and related information by one or more deans at

ABA-approved law schools during the time period relevant to the above-captioned proceeding.*

257. Electronic mail or another method of electronic communication was and/or is used to communicate law school tuition rates and related information by the deans at BCLS and Cornell Law School during the time periods relevant to the above-captioned proceeding.*

258. The deans at ABA-approved law schools meet each other at events on a regular basis during which the deans at ABA-approved law schools communicated law school tuition rates and related information amongst each other during the time period relevant to the above-captioned proceeding.

259. ABA-approved law schools, including BCLS and Cornell Law School, have agreed and/or continue to agree to fix, stabilize, or raise the cost of tuition by exchanging tuition pricing, admission, and related information with other ABA-approved law schools either in person, in writing, and/or by electronic communication.

260. Separate and apart from the Deans' LISTSERV and the use of email, both the Law School Admissions Council and the ABA provide electronic communications platforms to ABA-approved law schools, including BCLS and Cornell Law School, that provide competitive information and a forum through which such law schools to agree to fix, stabilize, or raise the cost of tuition by exchanging tuition pricing, admissions, and related information with other ABA-approved law schools.

261. The contract, combination, and/or conspiracy between ABA-approved law schools is so powerful that all or almost all of them continued to raise tuition prices even during periods of steep application declines, such as in or around the year 2013.

## LEGAL RELATIONSHIP BETWEEN RICO FORFEITURE AND THE FALSE CLAIMS ACT

262.   18 U.S.C. § 1963(c) holds that "[a]ll right, title, and interest in property described in

subsection (a) vests in the United States upon the commission of the act giving rise to

forfeiture under this section."

263.   18 U.S.C. § 1963 holds that

> Whoever violates any provision of section 1962 of this chapter shall be
> fined under this title or imprisoned not more than 20 years (or for life if
> the violation is based on a racketeering activity for which the maximum
> penalty includes life imprisonment), or both, and shall forfeit to the United
> States, irrespective of any provision of State law—
>
> > (1) any interest the person has acquired or maintained in violation
> > of section 1962;
> >
> > (2) any—
> >
> > > (A) interest in;
> > >
> > > (B) security of;
> > >
> > > (C) claim against; or
> > >
> > > (D) property or contractual right of any kind affording a
> > > source of influence over; any enterprise which the person
> > > has established, operated, controlled, conducted, or
> > > participated in the conduct of, in violation of section 1962;
> > > and
> >
> > (3) any property constituting, or derived from, any proceeds which
> > the person obtained, directly or indirectly, from racketeering
> > activity or unlawful debt collection in violation of section 1962.

264.   The right, title, and interest in the real and personal property for which forfeiture is

sought has already vested in the United States upon commission of the act giving rise to

forfeiture, namely a racketeering act, including joining a racketeering conspiracy.   See 18

U.S.C. § 1961(1) (enumerating racketeering acts); 18 U.S.C. § 1962 (enumerated RICO violations).

265. 31 U.S.C. § 3729(a)(1)(G) holds that "[a]ny person who ... knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ... is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 [...]."

266. As a matter of law, any person who knowingly conceals or knowingly and improperly avoids an obligation to transmit property to the United States that was forfeited upon commission of any act giving rise to forfeiture of that property pursuant to RICO has committed a reverse false claim actionable under 31 U.S.C. § 3729(a)(1)(G).[6]

267. The RELATOR has standing to bring a reverse false claim as to the named real and personal properties, 1) because the United States owned all right, title, and interest in any property upon commission of any violation of RICO; 2) because one or more of the Defendants knowingly concealed or knowingly and improperly avoided an obligation to transmit the property in question to the United States government; and 3) because the RELATOR has been injured in his business and/or property by the conduct of the ENTERPRISE.

## THE ENTERPRISE

268. The ENTERPRISE is an association-in-fact within the meaning of RICO.

269. The purpose of the ENTERPRISE was and/or is to:

---

[6] The knowing failure to convey property forfeited pursuant to RICO to the United States is an actionable reverse false claim.

    a.  Protect and advance the legal interests of its members by rigging the state and federal court system in the Commonwealth of Massachusetts;

    b.  Enriching the members and associates of the ENTERPRISE through bribes, gratuities, extortion, mail fraud, and wire fraud;

    c.  Preserving and protecting the power, territory, and profits of the ENTERPRISE through the use of harassment, intimidation, threats of violence, and assault[7];

    d.  Promoting and enhancing the activities of the ENTERPRISE and the members and/or associates of the ENTERPRISE; and

    e.  Keeping one or more victims in fear of the ENTERPRISE and in fear of its members and/or associates through harassment, intimidation, threats of violence, and assault.

270.    To achieve its purpose, the ENTERPRISE rigs the court systems in state and federal courts in Massachusetts by bribery, gratuities, extortion, threats of violence, and other racketeering acts while using BOSTON COLLEGE, and in particular, 885 CENTRE STREET, as a front for its criminal activities.

271.    Members and/or associates of the ENTERPRISE include, but may not be limited to, individuals, a university, and a law firm.

272.    Members and/or associates of the ENTERPRISE include, but may not be limited to (the "NAMED ASSOCIATES"):

    1)    ABBENE;

---

[7] Assault under Massachusetts tort law is defined as intentionally causing a reasonable apprehension of an imminent harmful or offensive contact. Conley v. Romeri, 60 Mass. App. Ct. 799, 805 n.6 (2004) ("Assault is a separate tort involving an act which puts another in reasonable apprehension of imminent harmful or offensive contact, that is, an attempted battery or an immediately threatened battery.").

2)   ARCHER;

3)   BARRON;

4)   CRAFTS;

5)   CRAY;

6)   CURTIN;

7)   DAWLEY;

8)   BRIAN DURKIN;

9)   THOMAS DURKIN;

10)   FARRELL;

11)   FATALE;

12)   FEINER;

13)   GILES;

14)   HEALEY;

15)   JOSEPH HERLIHY;

16)   SARAH HERLIHY;

17)   KATZMANN;

18)   KELLER;

19)   LAMPERT;

20)   LOWY;

21)   LYNCH;

22)   MACKEY;

23)   MAFFEI;

24)   MALONEY;

25) MAZZONE;

26) MESHNICK;

27) MURPHY;

28) NEYMAN;

29) OBAMA;

30) O'TOOLE;

31) ORTIZ;

32) ROUGEAU;

33) SAVERY;

34) SIMAS;

35) SOROKIN;

36) SQUIRES-LEE;

37) SWEENEY;

38) TARROW;

39) ULLMANN;

40) VERNER;

41) WALKER;

42) WOLOHOJIAN;

43) WILMERHALE; and

44) BOSTON COLLEGE.

273.   NAMED ASSOCIATES who received income from BOSTON COLLEGE and used that income in the operation of the ENTERPRISE, include, but may not be limited to (the "BC PAID ASSOCIATES"):

1)    ABBENE;

2)    CURTIN;

3)    FATALE;

4)    JOSEPH HERLIHY;

5)    SARAH HERLIHY;

6)    KELLER;

7)    LAMPERT;

8)    MACKEY;

9)    MAFFEI;

10)    ORTIZ;

11)    ROUGEAU;

12)    SAVERY;

13)    SOROKIN;

14)    SQUIRES-LEE;

15)    SWEENEY; and

16)    ULLMANN.

274. The BC PAID ASSOCIATES were and/or are paid according to BOSTON COLLEGE's electronic payroll system.

275. One or more of the BC PAID ASSOCIATES was paid by BCLS through one or more of the RELATOR's tuition payments.

276. NAMED ASSOCIATES who received income from WILMERHALE and used that income in the operation of the ENTERPRISE, include, but may not be limited to (the "WILMERHALE PAID ASSOCIATE"), or LAMPERT.

277.   The WILMERHALE PAID ASSOCIATE was and/or is paid according to WILMERHALE's electronic payroll system.

278.   NAMED ASSOCIATES who received income, directly or indirectly, from Equitable Sharing Program payments and used that income in the operation of the ENTERPRISE, include, but may not be limited to (the "DOJ PAID ASSOCIATES"):

1) COAKLEY;

2) CRAFTS;

3) CRAY;

4) DAWLEY;

5) FEINER;

6) HEALEY;

7) MAZZONE;

8) MESHNICK;

9) MURPHY;

10) SWEENEY;

11) TARROW;

12) VERNER; and

13) WALKER.

279.   One or more of the DOJ PAID ASSOCIATES personally benefitted from money deposited in the EQUITABLE SHARING ACCOUNTS.*

280.   By virtue of their physical presence at 885 CENTRE STREET or association with any person who was present at 885 CENTRE STREET at times relevant to this Complaint,

each and every one of the NAMED ASSOCIATES was in a position to acquire

Privileged Information by virtue of his or her respective position in the ENTERPRISE.

281. OBAMA was a leader of the ENTERPRISE at the White House and 2446 BELMONT

ROAD.

282. OBAMA directed one or more NAMED ASSOCIATES in carrying out unlawful and

other activities in furtherance of the conduct of the ENTERPRISE's affairs.

283. OBAMA was a leader of the ENTERPRISE at the White House.

284. OBAMA also operated through SIMAS, who visited the Boston, Massachusetts area,

including 885 CENTRE STREET, during and after OBAMA's tenure as president.

285. OBAMA utilized powers of the executive branch of the United States in order to advance

the objectives of the ENTERPRISE during at least some of the times relevant to the

matters herein in connection with carrying on the conduct of the ENTERPRISE.

286. HEALEY was a leader of the ENTERPRISE at 40 WINTHROP STREET.

287. HEALEY travelled to 885 CENTRE STREET and visited the White House on multiple

occasions during the time period relevant to the matters herein.

288. HEALEY directed one or more NAMED ASSOCIATES in carrying out unlawful and

other activities in furtherance of the conduct of the ENTERPRISE's affairs.

289. ORTIZ was a leader of the ENTERPRISE at 1 COURTHOUSE WAY and 885 CENTRE

STREET who travelled to the White House on multiple occasions during the time period

relevant to the matters herein.

290. ORTIZ directed one or more NAMED ASSOCIATES in carrying out unlawful and other

activities in furtherance of the conduct of the ENTERPRISE's affairs.

291.  ROUGEAU was a leader of the ENTERPRISE at 101 ASH STREET and 885 CENTRE STREET.

292.  ROUGEAU travelled to the White House during Gary Katzmann's 100-day wait to become a federal judge.

293.  ROUGEAU directed one or more NAMED ASSOCIATES in carrying out unlawful and other activities in furtherance of the conduct of the ENTERPRISE's affairs.

294.  BOSTON COLLEGE was a leader of the ENTERPRISE and directed one or more NAMED ASSOCIATES in carrying out unlawful and other activities in furtherance of the conduct of the ENTERPRISE's affairs.

295.  WILMERHALE was a leader of the ENTERPRISE and directed one or more NAMED ASSOCIATES in carrying out unlawful and other activities in furtherance of the conduct of the ENTERPRISE's affairs.d

296.  MAFFEI participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET and travelled to the White House prior to Judge Gary Katzmann's 100-day wait to become a federal judge.

297.  SIMAS participated in the conduct of the ENTERPRISE's affairs at the White House and 885 CENTRE STREET.

298.  BRIAN DURKIN participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET and 20 HARBOR STREET.

299.  SAVERY participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET.

300.  THOMAS DURKIN participated in the conduct of the ENTERPRISE's affairs at 20 HARBOR STREET.

301. The WILMERHALE PAID ASSOCIATE, or LAMPERT, participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET and at the John Adams Courthouse.

302. WOLOHOJIAN participated in the conduct of the ENTERPRISE's affairs at 40 WINTHROP STREET and at the John Adams Courthouse.

303. O'TOOLE, ORTIZ, SWEENEY, and BARRON participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET and at 1 COURTHOUSE WAY.

304. CRAFTS participated in the conduct of the ENTERPRISE's affairs at 3 PEMBERTON SQUARE and at 1 COURTHOUSE WAY.

305. SOROKIN participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET, 100 DAVIS AVENUE, and at 1 COURTHOUSE WAY.

306. SQUIRES-LEE and ULLMANN participated in the conduct of the ENTERPRISE's affairs at 885 CENTRE STREET and at 3 PEMBERTON SQUARE.

## INJURIES TO BUSINESS AND PROPERTY

307. The RELATOR sustained injuries in excess of $100,000 in connection with tuition payments made to BCLS by reason of the conduct of the ENTERPRISE.

308. The RELATOR sustained injuries in excess of $500 in connection with use of the official website of LSAC by reason of the conduct of the ENTERPRISE.

309. The RELATOR sustained injuries in excess of $1,000 in connection with filing fees made to the United States District Court for the District of Massachusetts, the U.S. Court of Appeals for the First Circuit, and courts of the Commonwealth of Massachusetts by reason of the conduct of the ENTERPRISE.

310.   By reason of the conduct of the ENTERPRISE, the RELATOR's Apple app business, Omnibus, LLC, a New Hampshire limited liability company, is 1) attempting to file Chapter 11 bankruptcy; 2) cannot afford an attorney; and 3) is precluded from having the RELATOR serve as an attorney for Omnibus, LLC, because the RELATOR was unable to graduate from BCLS.

311.   By reason of the conduct of the ENTERPRISE, the RELATOR has sustained injuries at or in excess of $360,000 in connection with his whistleblower bounty as a relator in the *Qui Tam* Action.

312.   By reason of the conduct of the ENTERPRISE, the RELATOR has sustained injuries at or in excess of $4,057,200 in connection with his whistleblower bounty as a relator in the Second *Qui Tam* Action.

313.   By reason of the conduct of the ENTERPRISE, the RELATOR has sustained injuries associated with the Parallel State Case, including, but not limited to, injuries in connection with his entitlement to recovery and damages as to the $360,000 bounty in which the RELATOR has a cognizable legal interest.

314.   By reason of the conduct of the ENTERPRISE, the RELATOR has expended money on litigation costs excluding court filing fees at or in excess of $1,000 in connection with cases in the United States District Court for the District of Massachusetts, the U.S. Court of Appeals for the First Circuit, and courts of the Commonwealth of Massachusetts.

**ALLEGATIONS COMMON TO ALL COUNTS**

315.   In 1996, NEYMAN was an Assistant District Attorney ("ADA") in Suffolk County, Massachusetts, where he prosecuted narcotics cases.

316.   NEYMAN and LOWY were colleagues in Suffolk County, Massachusetts in or about 1998.*

317.   On or about November 19, 1998, the Massachusetts Supreme Judicial Court, applying Dep't of Revenue of Montana v. Kurth Ranch, 511 U.S. 767 (1994), issued its opinion in the case of Commissioner of Revenue v. Mullins, 428 Mass 406 (1998), which found that assessment of the CST constituted punishment within the meaning of the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution.

318.   CRAY was counsel for the Commissioner of the Massachusetts Department of Revenue (the "Commissioner") before the Supreme Judicial Court in Mullins.

319.   Violation of the CST is a felony.

320.   On or about April 29, 1999, more than five months after Mullins, NEYMAN, as an ADA in Suffolk County, signed an indictment against a defendant in a crack cocaine distribution case (the "Crack Cocaine Case") pursuant to Mass.Gen.Laws ch. 94C § 32A(c).

321.   After Mullins, NEYMAN, as an ADA, declined to bring charges in 100% of cases pursuant to the CST in favor of bringing charges pursuant to Mass.Gen.Laws ch. 94C §§ 1 et seq. (the "Massachusetts Controlled Substances Act").

322.   The indictment in the Crack Cocaine Case could have alleged one or more violations of the CST instead of one or more violations of the Massachusetts Controlled Substances Act.

323.   Monies paid, seized, or otherwise deposited by the Commonwealth pursuant to the CST are deposited in the Commonwealth's general fund.

324. At all times relevant to the above-captioned action, the Massachusetts Controlled Substances Act provided a means for forfeiture of assets to law enforcement agencies of the Commonwealth in connection with a criminal narcotics case.

325. At all times relevant to the above-captioned action, federal law provided a means for forfeiture of assets to law enforcement agencies of the federal government and/or the Commonwealth in connection with a narcotics case.

326. Monies forfeited pursuant to the Massachusetts Controlled Substances Act are deposited and/or kept in bank accounts segregated from taxpayer funds.

327. Monies forfeited pursuant to federal narcotics laws are deposited and/or kept in bank accounts segregated from taxpayer funds.

328. Through the Equitable Sharing Program (the "Equitable Sharing Program"), the U.S. Department of Justice ("DOJ") and the U.S. Department of Treasury distribute a share of property and cash forfeited pursuant to federal law, such as the Controlled Substances Act (21 U.S.C. §§ 801 *et seq.*), to state and local law enforcement agencies.

329. One or more Massachusetts law enforcement agencies have been receiving cash proceeds and/or property from the Equitable Sharing Program since January 1, 1996 or earlier.

330. Pursuant to the rules and regulations of the Equitable Sharing Program, payments made to state and local law enforcement agencies are deposited and/or kept in bank accounts segregated from taxpayer funds.

331. Since at least January 1, 2012, the Commissioner has disseminated Form CST-1 for the purchase of marihuana and controlled substance tax stamps pursuant to the CST on the official website of the Commonwealth of Massachusetts.

332.   Form CST-1 contains no statement regarding a non-enforcement directive or policy as to the CST.

333.   Form CST-1 requires payments of $3.50 for each 1-gram marihuana tax stamp, $200 for each 1-gram controlled substance tax stamp, and $2,000 for 50 dosage unit tax stamps of a controlled substance not sold by weight.

334.   Cocaine and marijuana are subject to and/or regulated by the CST.

335.   Tax stamp purchases using Form CST-1 are non-refundable.

336.   Between approximately the years 2003 to 2005, SQUIRES-LEE, WOLOHOJIAN, and/or HEALEY worked at the same law firm, WILMERHALE, in Boston, Massachusetts.

337.   Prior to becoming Attorney General of the Commonwealth, HEALEY worked for approximately 11 years at WILMERHALE in Boston, Massachusetts.

338.   HEALEY's spouse, WOLOHOJIAN, worked for approximately 20 years at WILMERHALE in Boston, Massachusetts.

339.   SQUIRES-LEE hosted and/or participated in a fundraiser for HEALEY's first campaign for Attorney General of the Commonwealth of Massachusetts at the office of SQUIRES-LEE's former law firm.

340.   SQUIRES-LEE hosted a fundraiser at her house for HEALEY's first campaign for the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

341.   SQUIRES-LEE donated on more than one occasion to HEALEY's first campaign for Attorney General of the Commonwealth of Massachusetts.

342.   SQUIRES-LEE is a friend of HEALEY and/or WOLOHOJIAN.

343.   SQUIRES-LEE is a former colleague of HEALEY and/or WOLOHOJIAN at WILMERHALE.

344.    On or about March 26, 2014, the defendants in the *Qui Tam* Action (the "*Qui Tam* Defendants"), were charged in a federal criminal complaint (the "Federal Criminal Complaint") with conspiracy to distribute and distribution of more than five kilograms of cocaine in the United States District Court for the District of Massachusetts.

345.    The Federal Criminal Complaint alleged that the *Qui Tam* Defendants imported illegal narcotics from Mexico to Massachusetts in collaboration with the "Gulf Cartel," which is an international narcotics trafficking organization operating primarily between Mexico and the United States.

346.    The Federal Criminal Complaint against the *Qui Tam* Defendants included an affidavit detailing statements from a confidential informant that three kilograms of cocaine seized in Massachusetts from the confidential informant were procured by the confidential informant from the *Qui Tam* Defendants.

347.    The Federal Criminal Complaint against the *Qui Tam* Defendants included an affidavit stating that more than $1.5 million in cash was seized by agents of the U.S. Department of Justice from the *Qui Tam* Defendants at the time of their arrest pursuant to the Federal Criminal Complaint.

348.    The U.S. Department of Justice sought forfeiture of more than $1.5 million in cash seized from the *Qui Tam* Defendants pursuant to the federal Controlled Substances Act (the "Federal Controlled Substances Act," or 21 U.S.C. §§ 801 *et seq.*) in the United States District Court for the District of Massachusetts.

349.    On or about May 23, 2014, the U.S. Department of Justice charged multiple individuals in a federal criminal complaint (the "Marijuana Federal Criminal Complaint") with

conspiracy to distribute marijuana in the United States District Court for the District of Massachusetts.

350.  The Marijuana Federal Criminal Complaint alleged that multiple individuals shipped marijuana from California to Massachusetts.

351.  The Marijuana Federal Criminal Complaint included an affidavit signed by an agent of the Drug Enforcement Administration (the "DEA Agent") stating that the DEA Agent estimated that the individuals charged in the Marijuana Federal Criminal Complaint shipped approximately 1,900 kilograms of marijuana from California into Massachusetts.

352.  Prior to June 27, 2014, the RELATOR acquired multiple 1-gram marihuana tax stamps for $3.50 each and 1-gram controlled substance tax stamps for $200 each from the Commissioner totaling in excess of $500.

353.  On or about June 27, 2014, the RELATOR brought the *Qui Tam* Action pursuant to Mass.Gen.Laws ch. 12 §§ 5A-5O (the "Massachusetts False Claims Act" or "MFCA") in SUFFOLK SUPERIOR COURT and alleged that the *Qui Tam* Defendants had failed to purchase and affix tax stamps on three kilograms of cocaine acquired or possessed in the Commonwealth as required pursuant to the CST.[8]

354.  The RELATOR paid the full filing fee to SUFFOLK SUPERIOR COURT for the commencement of the *Qui Tam* Action.

355.  In the *Qui Tam* Action, the RELATOR submitted evidence in the form of the RELATOR's tax stamp purchases from the Commissioner to SUFFOLK SUPERIOR COURT demonstrating that the *Qui Tam* Defendants had not purchased tax stamps in the

---

[8] The RELATOR filed an amended complaint as to the *Qui Tam* Action in SUFFOLK SUPERIOR COURT at 3 PEMBERTON SQUARE on or about July 9, 2014.

amount of $600,000 as required pursuant to the CST upon acquisition or possession of three kilograms of cocaine in the Commonwealth of Massachusetts.

356. In the *Qui Tam* Action, the RELATOR alleged that, pursuant to the CST's 100% non-payment penalty, the *Qui Tam* Defendants had a financial obligation to the Commonwealth in the amount of $1,200,000 and that the *Qui Tam* Defendants had violated the MFCA as to the financial obligation to the Commonwealth in the amount of $1,200,000.

357. If the *Qui Tam* Defendants were criminally prosecuted and convicted pursuant to the CST for conduct alleged in the Federal Criminal Complaint, the *Qui Tam* Defendants would have been subject to at least a $1.2 million penalty payable to the general fund of the Commonwealth of Massachusetts.

358. If the *Qui Tam* Defendants were criminally prosecuted and convicted pursuant to the CST for conduct alleged in the Federal Criminal Complaint, the U.S. Department of Justice may have lost custody of or have been forced into litigation concerning at least $1.2 million in cash seized from the *Qui Tam* Defendants.

359. On or about July 16, 2014, the RELATOR brought a *qui tam* action (the "Second *Qui Tam* Action") pursuant to the MFCA in SUFFOLK SUPERIOR COURT with DOR as the *qui tam* plaintiff and alleged that the defendants in the Second *Qui Tam* Action (the "Second *Qui Tam* Defendants") had failed to purchase and affix tax stamps on 1,932 kilograms of marijuana acquired or possessed in the Commonwealth as required pursuant to the CST.

360. The RELATOR paid the full filing fee to SUFFOLK SUPERIOR COURT for the commencement of the Second *Qui Tam* Action.

361.  In the Second *Qui Tam* Action, the RELATOR submitted evidence in the form of the
      RELATOR's tax stamp purchases from the Commissioner to SUFFOLK SUPERIOR
      COURT demonstrating that the *Qui Tam* Defendants had not purchased tax stamps in the
      amount of $6,762,000 as required pursuant to the CST upon acquisition or possession of
      1,932 kilograms of marijuana in the Commonwealth of Massachusetts.

362.  In the Second *Qui Tam* Action, the RELATOR alleged that, pursuant to the CST's 100%
      non-payment penalty, the Second *Qui Tam* Defendants had a financial obligation to the
      Commonwealth in the amount of $13,524,000 and that the Second *Qui Tam* Defendants
      had violated the MFCA as to the financial obligation to the Commonwealth in the amount
      of $13,524,000.

363.  If the Second *Qui Tam* Defendants were criminally prosecuted and convicted pursuant to
      the CST for conduct alleged in the Federal Criminal Complaint, the *Qui Tam* Defendants
      would have been subject to at least a $13,524,000 penalty payable to the general fund of
      the Commonwealth of Massachusetts.

364.  If the Second *Qui Tam* Defendants were criminally prosecuted and convicted pursuant to
      the CST for conduct alleged in the Marijuana Federal Criminal Complaint, the U.S.
      Department of Justice may have lost custody of or have been forced into litigation
      concerning any cash or property seized from the Second *Qui Tam* Defendants.

365.  If the Second *Qui Tam* Defendants were criminally prosecuted and convicted pursuant to
      the CST for conduct alleged in the Marijuana Federal Criminal Complaint, the
      RELATOR could have earned a bounty of over $4 million.

366.  White House visitor logs show that ORTIZ visited the White House on or about August
      13, 2014.

367.  On or about October 3, 2014, the Attorney General of the Commonwealth served on the RELATOR a motion to dismiss and a memorandum of law in support of her motion to dismiss the *Qui Tam* Action (the "Dismissal Papers") in SUFFOLK SUPERIOR COURT.

368.  On or about October 3, 2014, COAKLEY, CRAFTS, and/or an employee of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH mailed the Dismissal Papers through the United States Postal Service to the RELATOR.

369.  The Dismissal Papers show COAKLEY, as Attorney General of the Commonwealth, and CRAFTS, as Assistant Attorney General of the Commonwealth, on the signature line.

370.  In the Dismissal Papers, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH represented in writing to SUFFOLK SUPERIOR COURT that

> The arguments relied on by the Commonwealth in support of this Motion represent the type of "'non-merits, non-jurisdictional rules of dismissal'" which properly precede resolution of subject matter jurisdiction questions.

371.  In the Dismissal Papers, the Attorney General represented in writing to SUFFOLK SUPERIOR COURT that "[f]ollowing the Mullins decision, the Commissioner [of the Massachusetts Department of Revenue] directed DOR to abstain from enforcing the Controlled Substances Tax" (the "Secret CST Suspension Directive").

372.  In the Dismissal Papers, the Attorney General represented in writing to SUFFOLK SUPERIOR COURT that, as to the CST, "[t]he Commissioner determined that enforcement of this statute would result in an administrative burden for DOR and would jeopardize potential criminal prosecutions in the Commonwealth, and that "[t]his instruction was appropriate and within the discretion of the Commissioner."

373. The Commissioner publishes all Department of Revenue rules, regulations, directives, and determinations on the official website of the Commonwealth of Massachusetts.*

374. There was no evidence of the existence of the Secret CST Suspension Directive when the *Qui Tam* Action commenced.*

375. There was no evidence of the existence Secret CST Suspension Directive when the Dismissal Papers were mailed, except for representations made in the Dismissal Papers or in connection with the preparation of the Dismissal Papers.*

376. Since the *Qui Tam* Action commenced, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and the Commissioner have not provided the RELATOR with any document or documents setting forth the text, date, and/or manner of dissemination of the Secret CST Suspension Directive.

377. One one or more of the NAMED ASSOCIATES and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH collaborated on the preparation and/or drafting of the Dismissal Papers.

378. In the Dismissal Papers, there was no information concerning one or more payments accepted or intended to be accepted from the Equitable Sharing Program.

379. In the Dismissal Papers, there was no information concerning any financial interest of one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and/or the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH as an institution.

380. In the Dismissal Papers, there was no information concerning money accepted by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and/or one

or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH from the Equitable Sharing Program.

381. In the Dismissal Papers, there was no information concerning the forfeiture of assets to law enforcement agencies of the Commonwealth pursuant to state and/or federal narcotics laws.

382. One or more of the NAMED ASSOCIATES and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH fabricated the Secret CST Suspension Directive in the Dismissal Papers.*

383. One or more of the NAMED ASSOCIATES and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH fabricated the Secret CST Suspension Directive in the Dismissal Papers in order to use the Secret CST Suspension Directive to hide, conceal, and/or obscure an agreement or agreements to accept money from the Equitable Sharing Program in exchange for moving to dismiss the *Qui Tam* Action or for not prosecuting the *Qui Tam* Defendants.*

384. On or about October 23, 2014, CRAFTS and/or an employee of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH filed the Dismissal Papers and the RELATOR's opposition thereto with SUFFOLK SUPERIOR COURT.

385. On or about October 23, 2014, CRAFTS mailed or caused to be mailed to the RELATOR an affidavit required by Superior Court Rule 9A.

386. On or about November 17, 2014, SUFFOLK SUPERIOR COURT held oral argument (the "Superior Court Oral Argument") concerning the Dismissal Papers.

387. On or about November 18, 2014, an employee of the Commonwealth signed and/or submitted electronically or by mail one or more requests to the Equitable Sharing

Program at the U.S. Department of Justice in connection with activities of the OFFICE

OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

388.   At the Superior Court Oral Argument, CRAFTS and CRAY, along with Joe Tierney from

the Massachusetts Department of Revenue, appeared for the Commonwealth.

389.   At the Superior Court Oral Argument, CRAFTS represented to SUFFOLK SUPERIOR

COURT that

> [T]he Commissioner of Revenue, after the 1998 <u>Mullins</u> decision, directed
> DOR not to enforce the Controlled Substances Tax. People have
> voluntarily complied with the tax since then but very, very few. And the
> instruction, the Commissioner's instruction was appropriate and it's
> something that as he was delegated that authority by the legislature so it's
> in his power to decide which laws to enforce or not to enforce.

390.   On or about December 10, 2014, SUFFOLK SUPERIOR COURT allowed the Attorney

General's motion to dismiss the *Qui Tam* Action.

391.   On or about December 18, 2014, the OFFICE OF THE ATTORNEY GENERAL OF

THE COMMONWEALTH received an email regarding an electronic payment ("DOJ

Wire #1") from the Equitable Sharing Program from the U.S. Marshals Service,

Massachusetts in the amount of $69,364.57 to the OFFICE OF THE ATTORNEY

GENERAL OF THE COMMONWEALTH.

392.   On or about December 31, 2014, the RELATOR filed a notice of appeal of SUFFOLK

SUPERIOR COURT's dismissal of the *Qui Tam* Action.

393.   On or about January 14, 2015, VERNER signed and/or submitted electronically or by

mail one or more requests to the Equitable Sharing Program at the U.S. Department of

Justice in connection with activities of the OFFICE OF THE ATTORNEY GENERAL

OF THE COMMONWEALTH.

394. On or about February 11, 2015, an employee of the Commonwealth received a check (the
"Equitable Sharing Check") under the Equitable Sharing Program from the IRS in the
amount of $949,919.10.

395. DAWLEY, MAZZONE, MURPHY, and/or VERNER sent and/or received one or more
emails concerning the Equitable Sharing Check.

396. White House visitor logs show that ORTIZ visited the White House on or about February
17, 2015.

397. White House visitor logs show that ORTIZ visited the White House on or about February
18, 2015.

398. White House visitor logs show that HEALEY met with SIMAS on or about March 3,
2015 at the White House.

399. On or about March 13, 2015, the U.S. Department of Justice published on its official
website the statistics for federal Fiscal Year 2014 Equitable Sharing Program payments
of cash and sale proceeds to law enforcement agencies of the Commonwealth of
Massachusetts.

400. According to public records available to the RELATOR, the IRS and/or the Department
of Treasury made one or more payments to law enforcement agencies of the
Commonwealth of Massachusetts during 2014, 2015, and/or 2016.

401. The U.S. Department of Justice made no public disclosure as to the statistics for
Equitable Sharing Program payments of cash and sale proceeds to law enforcement
agencies of the Commonwealth of Massachusetts during federal Fiscal Year 2014 up
until the disclosure on its official website on or about March 13, 2015.

402. The U.S. Department of Justice made no public disclosure as to statistics of Equitable Sharing Program payments of cash and sale proceeds during federal Fiscal Year 2014 in any state or federal court case in which the RELATOR was and/or is a party and in which the U.S. Department of Justice was and/or is a party and/or acted as counsel.

403. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH made no disclosure as to receipt of Equitable Sharing Program payments of cash and sale proceeds during federal Fiscal Year 2014 in three or more state or federal court cases in which the RELATOR was and/or is a party and in which the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH was and/or is a party and/or acted as counsel.

404. Absent a court-ordered disclosure, the RELATOR had no way of ascertaining the statistics for federal Fiscal Year 2014 Equitable Sharing Program payments of cash and sale proceeds from the U.S. Department of Justice to law enforcement agencies of the Commonwealth of Massachusetts until after the U.S. Department of Justice published such statistics on or about March 13, 2015.

405. On or about March 29, 2015, the RELATOR paid a fee and submitted an application for the juris doctor program at Boston College Law School through a website operated by LSAC.

406. Boston College Law School is owned, operated, and/or controlled by BOSTON COLLEGE.

407. On or about March 29, 2015, the RELATOR paid a fee and submitted an application for the juris doctor program at Cornell Law School through a website operated by LSAC.

408. Cornell Law School is owned, operated, and/or controlled by Cornell University.

409. In his personal statement in his applications to Boston College Law School and Cornell Law School, the RELATOR wrote about being a *pro se* litigant in litigation concerning the CST.

410. ROUGEAU resided at 101 ASH STREET during some or all of the time that the RELATOR was a student at BCLS.*

411. ROUGEAU used 101 ASH STREET to carry on the affairs of the ENTERPRISE, including by communicating with one or more other of the NAMED ASSOCIATES at or around 101 ASH STREET.

412. ROUGEAU used 885 CENTRE STREET to carry on the affairs of the ENTERPRISE, including by communicating with one or more other of the NAMED ASSOCIATES at or around 885 CENTRE STREET.

413. On or about April 1, 2015, 1) ROUGEAU and SWEENEY, 2) FATALE and SWEENEY, and/or 3) FATALE and ROUGEAU communicated concerning the RELATOR's application to BCLS and/or the RELATOR's litigation.*

414. On or about April 7, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made an accounting record of an electronic or check payment (the "April 7 Payment") from the Equitable Sharing Program in the amount of $12,543.00

415. On or about April 8, 2015, the appeal of the dismissal of the *Qui Tam* Action was entered in the Massachusetts Appeals Court.

416. On or about April 13, 2015, the RELATOR received a phone call from an employee of Boston College Law School notifying the RELATOR that he had been accepted for the juris doctor program at Boston College Law School.

417.   On or about April 13, 2015, the RELATOR received a phone call from an employee of
       Boston College Law School notifying the RELATOR that he had one week to accept the
       offer of admission to Boston College Law School by paying a deposit of approximately
       $500 and that if the RELATOR did not accept the offer of admission within one week by
       paying a deposit of approximately $500, then Boston College Law School would rescind
       the RELATOR's acceptance to Boston College Law School.

418.   On or about April 13, 2015, the RELATOR received an email from Boston College Law
       School notifying him that he had been accepted for the juris doctor program at Boston
       College Law School.

419.   On or about April 15, 2015, the RELATOR mailed a deposit of approximately $500 to
       attend the juris doctor program at Boston College Law School.

420.   On or about April 20, 2015, LSAC was made aware that the RELATOR sent a deposit to
       attend the juris doctor program at Boston College Law School.*

421.   On or about April 20, 2015, one or more employees of Cornell Law School was made
       aware that the RELATOR sent a deposit to attend the juris doctor program at Boston
       College Law School through the website of LSAC.*

422.   On or about April 20, 2015, one or more employees of Cornell Law School was made
       aware that the RELATOR sent a deposit to attend the juris doctor program at Boston
       College Law School by an employee of Boston College Law School.*

423.   On or about April 27, 2015, the RELATOR received an email from Cornell Law School
       notifying him that he had been denied admission to the juris doctor program at Cornell
       Law School.

424.  The decision by Cornell Law School to deny admission to the RELATOR for the juris
doctor program at Cornell Law School was made after one or more employees at Cornell
Law School became aware that the RELATOR had sent a deposit to attend the juris
doctor program at Boston College Law School through the LSAC website and/or by an
employee of Boston College Law School and/or LSAC.*

425.  LSAC provides participating law schools, including, but not limited to, Cornell Law
School and Boston College Law School, with a website through which application
information for a particular applicant can be viewed, including the name or names of
each law school where an application was submitted and/or the application or deposit
status of each law school where an application was submitted.*

426.  Cornell Law School, Boston College Law School, and/or other participating law schools
use a website provided by LSAC to prevent providing admission to students who have
already decided to attend or provided a deposit to attend a different law school, thereby
lowering the percentage of students admitted.*

427.  On or about May 21, 2015, DAWLEY sent a portion of the Equitable Sharing Check to
the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH in the
amount of $316,870.75.

428.  On or about May 28, 2015, MAZZONE submitted a deposit form to the Budget Office of
the OFFICE OF THE ATRORNEY GENERAL OF THE COMMONWEALTH for the
portion of the Equitable Sharing Check that was sent to the OFFICE OF THE
ATTORNEY GENERAL OF THE COMMONWEALTH in the amount of $316,870.75.

429.  On or about May 22, 2015, SIMAS was introduced by ROUGEAU prior to SIMAS's
commencement address to the Class of 2015 at Boston College Law School.

430.   On or about June 2, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made an accounting record of an electronic or check payment (the "June 2 Payment") from the Equitable Sharing Program in the amount of $316,870.75.

431.   On or about June 4, 2015, the RELATOR served his opening brief in the Massachusetts Appeals Court in the appeal of the dismissal of the Qui Tam Action by SUFFOLK SUPERIOR COURT.

432.   On or about June 22, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made accounting records of multiple check and/or electronic payments (the "June 22 Payments") from the Equitable Sharing Program totaling in excess of $30,000.

433.   On or about June 25, 2015, CRAFTS filed a motion for summary disposition and for leave to file a memorandum in lieu of a brief (the "Summary Disposition Memorandum") in the First Circuit Appeal by SUFFOLK SUPERIOR COURT in the Massachusetts Appeals Court.

434.   The Summary Disposition Memorandum stated that the Commissioner issued the Secret CST Suspension Directive.

435.   The Summary Disposition Memorandum stated that after Mullins, the Commissioner suspended enforcement of the CST.

436.   The Summary Disposition Memorandum did not mention payments received by one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH through the Equitable Sharing Program from the U.S. Department of Justice and/or the U.S. Department of Treasury.

437.  The Summary Disposition Memorandum did not mention a conflict of interest as to representation of the Commonwealth by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

438.  The Dismissal Papers show HEALEY, as Attorney General of the Commonwealth, and CRAFTS, as Assistant Attorney General of the Commonwealth, on the signature line.

439.  On or about June 25, 2015, CRAFTS mailed the Summary Disposition Memorandum through the United States Postal Service to the RELATOR.

440.  On or about July 6, 2015, CARHART entered an order which referred the Summary Disposition Memorandum to the panel designated to decide the appeal.

441.  40 WINTHROP STREET was and/or is being used to carry on or advance the purpose of the ENTERPRISE by WOLOHOJIAN and HEALEY.

442.  On or about July 7, 2015, WOLOHOJIAN warned HEALEY regarding Justice Gary Katzmann's participation in the First Circuit Appeal in the Massachusetts Appeals Court at 40 WINTHROP STREET.*

443.  On or about July 7, 2015, one or more of the NAMED ASSOCIATES and/or one or employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH communicated with one or more officials of the executive branch of the United States about nominating Gary Katzmann to be a federal judge in order to remove Gary Katzmann from or influence Gary Katzmann in the disposition of the appeal of the dismissal of the *Qui Tam* Action.*

444.  On or about July 30, 2015, OBAMA nominated Jennifer Choe Groves to be a judge of the United States Court of International Trade.

445.    On or about July 30, 2015, OBAMA nominated Gary Katzmann to be a judge of the United States Court of International Trade.

446.    OBAMA intended to offer Gary Katzmann a judgeship on the United States Court of International Trade because of or in exchange for a favorable ruling and/or to influence the outcome in the appeal of the dismissal of the *Qui Tam* Action.*

447.    On or about August 17, 2015, the RELATOR began attending classes at BCLS at 885 CENTRE STREET as a first-year law student.

448.    THOMAS DURKIN provided BRIAN DURKIN with money to carry on the affairs of the ENTERPRISE during the years of 2015, 2016, 2017 and/or 2018.*

449.    BOSTON COLLEGE provided LAMPERT with money through teaching assistant positions to carry on the affairs of the ENTERPRISE during the years of 2016, 2017 and/or 2018.

450.    BRIAN DURKIN, THOMAS DURKIN, and LAMPERT knew each other prior to attending classes at BCLS at 885 CENTRE STREET.

451.    THOMAS DURKIN, BRIAN DURKIN, and/or LAMPERT were present at, communicated regarding, and/or conducted the business of the ENTERPRISE at 20 HARBOR STREET during the years of 2015, 2016, 2017 and/or 2018.*

452.    LAMPERT and/or or a family member of LAMPERT owns and/or resides at the 41 PHILLIPS STREET APARTMENT.*

453.    LAMPERT and BRIAN DURKIN lived in the same apartment during some or all of the years 2015, 2016, 2017, and/or 2018.

454.    LAMPERT and BRIAN DURKIN attended the same high school at the same time.*

455.  On one or more occasions in the years 2015, 2016, 2017, and/or 2018, LAMPERT and/or BRIAN DURKIN used the TACOMA for transportation to BCLS.

456.  One or more of the NAMED ASSOCIATES, one or more employees of WILMERHALE, and/or one or more employees of BOSTON COLLEGE monitored the RELATOR's Boston College email account ("the "BC Email Account") during some or all of the time that the RELATOR was a student at BCLS at 885 CENTRE STREET.*

457.  One or more of the NAMED ASSOCIATES, one or more employees of WILMERHALE, and/or one or more employees of BOSTON COLLEGE monitored and/or performed physical surveillance of the RELATOR during some or all of the time that the RELATOR was a student at BCLS at 885 CENTRE STREET.*

458.  On or about August 17, 2015, ROUGEAU gave a speech (the "Anti-Trump Speech") at BCLS at 885 CENTRE STREET where the RELATOR was in attendance.

459.  In the Anti-Trump Speech, ROUGEAU mocked the plan of then-candidate for President of the United States, Donald J. Trump, to build a wall on the Mexico-United States border in front of more than one hundred people.

460.  ROUGEAU is a former classmate of OBAMA's wife, Michelle Obama, at Harvard Law School.

461.  ROUGEAU was and/or is a public advocate for opening the borders of the United States.

462.  Beginning on or about August 17, 2015 and at various times when the RELATOR attended classes at BCLS at 885 CENTRE STREET, one or more employees at BOSTON COLLEGE shared or communicated information from the BC Email Account to one or more of the NAMED ASSOCIATES.*

463. On or about September 1, the RELATOR obtained accounts (the "Legal Research Accounts") for legal research services from WestLaw and LexisNexis through BOSTON COLLEGE.

464. One or more of the NAMED ASSOCIATES sent, received, or otherwise obtained information from the Legal Research Accounts on one or more occasions while the RELATOR was a student at BCLS at 885 CENTRE STREET.*

465. Beginning on or about September 1, 2015 to and including at least September 15, 2018, the RELATOR used the Legal Research Accounts and the BC Email Account to store, obtain, or otherwise transmit privileged legal information (the "Privileged Information") concerning the RELATOR's litigation.

466. One or more of the NAMED ASSOCIATES, one or more employees of WILMERHALE, and/or one or more employees of BOSTON COLLEGE acquired or possessed Privileged Information during some or all of the time that the RELATOR was a student at BCLS at 885 CENTRE STREET.*

467. One or more other NAMED ASSOCIATES began communicating pieces of Privileged Information in or about September 2015 by electronic and non-electronic means.*

468. On or about September 7, 2015, OBAMA and HEALEY met in person in or around Boston, Massachusetts.

469. On or about October 2, 2015, LYNCH, ORTIZ, and HEALEY met in person in or around Waltham, Massachusetts.

470. On or about November 5, 2015, ROUGEAU, SIMAS, MAZZONE, and/or CURTIN attended the same event in or around Newton, Massachusetts.

471. On or about November 9, 2015, the Massachusetts Appeals Court sent a notice seeking information on unavailability for oral argument in January 2016 as to the appeal of the dismissal of the *Qui Tam* Action.

472. On or about November 23, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH received an electronic or check payment (the "November 23 Payment") from the Equitable Sharing Program in the amount of $127,378.80

473. On or about December 18, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH received an email regarding an electronic payment ("DOJ Wire #2") from the Equitable Sharing Program in the amount of $22,298.53 to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

474. On or about January 10, 2016, the RELATOR electronically transferred approximately $25,990 to BOSTON COLLEGE and BOSTON COLLEGE BANK ACCOUNTS using a BOSTON COLLEGE electronic payment website.

475. On or about January 11, 2016, the Massachusetts Appeals Court held oral argument (the "Appeals Court Oral Argument") at the John Adams Courthouse as to the RELATOR's appeal of SUFFOLK SUPERIOR COURT's allowance of the Attorney General's motion to dismiss the *Qui Tam* Action.

476. At the Appeals Court Oral Argument, CRAFTS stated that, "[s]ince the Mullins decision came down, the Commissioner of Revenue determined that there would be absolutely no enforcement of the Controlled Substances Tax either with respect to referrals from law enforcement or otherwise."

477. At the Appeals Court Oral Argument, Justice Gary Katzmann asked CRAFTS, "Where is that in the record, that the Commissioner has made that determination?"

478.   At the Appeals Court Oral Argument, CRAFTS responded to Justice Gary Katzmann's question as to "Where is that in the record, that the Commissioner has made that determination," by stating that, "[i]t's in the brief.  There's no support for it in the record."

479.   At the Appeals Court Oral Argument, one or more Boston College Law School students was present in the courtroom.

480.   At the Appeals Court Oral Argument, Nicholas Green, who was then a Boston College Law School student, was present in the courtroom or at the John Adams Courthouse.

481.   On or about January 11, 2016, Nicholas Green reported the RELATOR's participation in and the course of events at the Appeals Court Oral Argument to one or more of the NAMED ASSOCIATES and/or one or more faculty members at BCLS at 885 CENTRE STREET.*

482.   On or about January 11, 2016, KELLER was made aware of the RELATOR's participation in and the course of events at the Appeals Court Oral Argument by one or more BCLS Class of 2017 law students was present at the Appeals Court Oral Argument.*

483.   White House visitor logs show that HEALEY visited the White House on or about January 12, 2016.

484.   On or about January 13, 2016, LYNCH and HEALEY met in person in or around Boston, Massachusetts.

485.   On or about January 20, 2016, LYNCH, ORTIZ, and HEALEY met in person in or around Boston, Massachusetts.

486.   On or about January 27, 2016, the U.S. Department of Justice published on its official website the statistics for federal Fiscal Year 2015 Equitable Sharing Program payments of cash and sale proceeds to law enforcement agencies of the Commonwealth of Massachusetts.

487.   The U.S. Department of Justice made no public disclosure as to the statistics for Equitable Sharing Program payments of cash and sale proceeds to law enforcement agencies of the Commonwealth of Massachusetts during federal Fiscal Year 2015 up until the disclosure on its official website on or about January 27, 2016.

488.   The U.S. Department of Justice made no public disclosure as to statistics of Equitable Sharing Program payments of cash and sale proceeds during federal Fiscal Year 2015 in any state or federal court case in which the RELATOR was and/or is a party and in which the U.S. Department of Justice was and/or is a party and/or acted as counsel.

489.   On or about January 27, 2016, the Committee on the Judiciary of the United States Senate held a hearing to consider the nominations of Gary Katzmann and Jennifer Choe Groves to be judges on the U.S. Court of International Trade.

490.   On or about January 27, 2016, Gary Katzmann and Jennifer Choe Groves both testified during the same hearing before the Committee on the Judiciary of the United States Senate.

491.   The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH made no disclosure as to receipt of Equitable Sharing Program payments of cash and sale proceeds during federal Fiscal Year 2015 in any state or federal court case in which the RELATOR was and/or is a party and in which the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH was and/or is a party and/or acted as counsel.

492. Absent disclosure from DOJ or the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, the RELATOR had no way of ascertaining the statistics for federal Fiscal Year 2015 Equitable Sharing Program payments of cash and sale proceeds from the U.S. Department of Justice to law enforcement agencies of the Commonwealth of Massachusetts until after the U.S. Department of Justice published such statistics on or about January 27, 2016.

493. White House visitor logs show that HEALEY visited the White House on or about January 29, 2016.

494. On or about February 23, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made accounting records of multiple check and/or electronic payments (the "February 23 Payments") from the Equitable Sharing Program totaling in excess of $15,000.

495. On or about February 24, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made accounting records of multiple check and/or electronic payments (the "February 24 Payments") from the Equitable Sharing Program totaling in excess of $15,000.

496. On or about February 24, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with NEYMAN at the John Adams Courthouse.

497. On or about February 25, 2015, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH deposited and/or made accounting records of multiple check and/or electronic payments (the "February 25 Payments") from the Equitable Sharing Program totaling in excess of $60,000.

498.  The February 23 Payments, February 24 Payments, and February 25 Payments
      (altogether, the "February 2016 Payments) totaled in excess of $90,000.

499.  On or about March 1, 2016, the RELATOR sent KELLER an email (the "First Keller
      Email") from the BC Email Account requesting help for a brief due before the Court of
      Appeals for the First Circuit.

500.  KELLER did not send a response to the BC Email Account to the First KELLER Email.

501.  On or about March 3, 2016, WOLOHOJIAN served on one or more appellate panels
      hearing oral argument with Justices Judd CARHART and C. Jeffrey KINDER at the John
      Adams Courthouse.

502.  On or about March 23, 2016, an email (the "Two Federal Judges Email") was sent to all
      Boston College Law School students stating that "I wanted to make sure you are aware
      that two Federal judges are coming to campus for major events in the next couple of
      weeks."

503.  The Two Federal Judges Email noted that BARRON and O'TOOLE would be appearing
      at events at Boston College Law School.

504.  The visits of BARRON and O'TOOLE were both organized in or around March 2016.*

505.  On or about March 28, 2016, WOLOHOJIAN served on one or more appellate panels
      hearing oral argument with Justices Judd CARHART and C. Jeffrey KINDER at the John
      Adams Courthouse.

506.  White House visitor logs show that HEALEY visited the White House on or about March
      28, 2016.

507.  On or about March 29, 2016, Judge David BARRON of the U.S. Court of Appeals for the
      First Circuit attended an event on the Newton, MA campus of BCLS.

508. BARRON's attendance at an event at BCLS at 885 CENTRE STREET was sponsored in whole or in part by the Office of the Dean, or ROUGEAU, using proceeds from one or more of the RELATOR's tuition payments.*

509. The RELATOR attended all or part of the public event in which BARRON participated on or about March 29, 2016 at BCLS at 885 CENTRE STREET.

510. On or about April 6, 2016, George A. O'TOOLE, Jr. attended an event on the Newton, MA campus of BCLS.

511. On or about April 13, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with NEYMAN at the John Adams Courthouse.

512. On or about April 13, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with Justice C. Jeffrey KINDER at the John Adams Courthouse.

513. On or about April 13, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with NEYMAN and Justice C. Jeffrey KINDER at the John Adams Courthouse.

514. On or about April 20, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with Justices Judd CARHART and C. Jeffrey KINDER at the John Adams Courthouse.

515. On or about April 21, 2016, the RELATOR filed a motion for an extension of time to file his opening brief in the appeal of the dismissal of the First Federal Action where such brief was due to be filed on April 20, 2016.

516. White House visitor logs show that MAFFEI visited the White House on or about April 22, 2016.

517.   On or about April 25, 2016, the RELATOR filed his brief in the appeal of the dismissal of the First Federal Action.

518.   On or about April 27, 2016, WOLOHOJIAN served on one or more appellate panels hearing oral argument with Justices Judd CARHART and C. Jeffrey KINDER at the John Adams Courthouse.

519.   During the summer of 2016, LAMPERT was an intern in the Office of the U.S. Attorney for the District of Massachusetts under ORTIZ.

520.   During the years of 2016 and/or 2017, BRIAN DURKIN was a law clerk for a judge of the United States District Court for the District of Massachusetts at 1 COURTHOUSE WAY.

521.   White House visitor logs show that HEALEY visited the White House on or about May 24, 2016.

522.   On or about June 6, 2016, the United States Senate confirmed Gary Katzmann as a judge for the United States Court of International Trade.

523.   On or about June 6, 2016, the United States Senate confirmed Jennifer Choe Groves as a judge for the United States Court of International Trade.

524.   On or about June 8, 2016, Jennifer Choe Groves received her commission to be a judge for the United States Court of International Trade from OBAMA.

525.   White House visitor logs show that ROUGEAU visited the White House on or about July 26, 2016.

526.   White House visitor logs show that ORTIZ visited the White House on or about July 27, 2016.

527.  On or about August 9, 2016, the RELATOR's appeal of the dismissal of the First Federal
Action was submitted to an appellate panel (the "First Circuit Panel") in the U.S. Court of
Appeals for the First Circuit comprised of Judges Sandra Lynch, William Kayatta, Jr.,
and David BARRON.

528.  On or about August 18, 2016, the RELATOR electronically transferred approximately
$26,761 to BOSTON COLLEGE and BOSTON COLLEGE BANK ACCOUNTS using a
BOSTON COLLEGE electronic payment website.

529.  During the fall 2016 semester at BCLS, LAMPERT was a law clerk for LOWY at the
Massachusetts Supreme Judicial Court.*

530.  On or about August 22, 2016, in an order signed by Justices Gary Katzmann, Judd
CARHART, and C. Jeffrey KINDER, the Massachusetts Appeals Court issued an
unpublished memorandum and order pursuant to Appeals Court Rule 1:28 (the "Appeals
Court Opinion") affirming SUFFOLK SUPERIOR COURT's dismissal of the *Qui Tam*
Action.

531.  The Appeals Court Opinion found that "[i]t is now beyond dispute that assessment of the
CST has a criminal law component that implicates prosecutorial discretion."

532.  A number of law enforcement agencies of the Commonwealth of Massachusetts,
including the OFFICE OF THE ATTORNEY GENERAL OF THE
COMMONWEALTH, accepted approximately $7,719,173 through the Equitable Sharing
Program in federal Fiscal Year 2014, during which time the same agencies declined to
bring any criminal prosecutions pursuant to the CST in 100% of cases.

533.  Federal Fiscal Year 2014 was October 1, 2013 to September 30, 2014.

534.    A number of law enforcement agencies of the Commonwealth of Massachusetts,

including the OFFICE OF THE ATTORNEY GENERAL OF THE

COMMONWEALTH, accepted approximately $6,209,584 through the Equitable Sharing

Program in federal Fiscal Year 2015, during which time the same agencies declined to

bring any criminal prosecutions pursuant to the CST in 100% of cases.

535.    Federal Fiscal Year 2015 was October 1, 2014 to September 30, 2015.

536.    On or about September 9, 2016, the RELATOR filed in the Massachusetts Appeals Court

(1) a motion to disqualify the Attorney General alleging that the Attorney General had a

financial conflict of interest and was acting in apparent contravention of Mass.Gen.Laws

ch. 268 § 36; (2) a petition for rehearing; and (3) a motion requesting judicial notice[9] of

adjudicative facts (the "Judicial Notice Motion"), including, *inter alia*, evidence of the

Attorney General's receipt of payments totaling $360,755 in seized cash and property

from the U.S. Department of Justice's Equitable Sharing Program in federal Fiscal Years

2014 and 2015, including $291,390 in FY2014 and $69,365 in FY2015 (altogether, the

"Rehearing Papers").

537.    The Judicial Notice Motion included a printed copy from the DOJ's official website of

Equitable Sharing Program payments to law enforcement agencies of the

Commonwealth, including the OFFICE OF THE ATTORNEY GENERAL OF THE

COMMONWEALTH, for federal Fiscal Years 2014 and 2015.

538.    As the RELATOR pursuant to the MFCA, the RELATOR's maximum potential bounty

in the *Qui Tam* Action is statutorily limited to $360,000 (30% of $1,200,000).[10]

---

[9] The motion requesting judicial notice was docketed on September 12, 2016 in the
Massachusetts Appeals Court.
[10] Because the CST has a criminal law component, the civil penalty multiplier of the MFCA
cannot apply as a matter of law to the penalty calculation in the *Qui Tam* Action.

539.    The difference between the RELATOR's maximum potential bounty upon prevailing in

the *Qui Tam* Action and the amount accepted from the U.S. Department of Justice

through the Equitable Sharing Program by the OFFICE OF THE ATTORNEY

GENERAL OF THE COMMONWEALTH during federal Fiscal Years 2014 and 2015 is

$755, or approximately two-tenths of one percent.

540.    Federal Fiscal Years 2014 and 2015 coincide with the commencement, dismissal, and

appeal of the *Qui Tam* Action.

541.    On or about September 13, 2016, in an order signed by Justices Gary Katzmann, Judd

CARHART, and C. Jeffrey KINDER, the Massachusetts Appeals Court ordered that

"[t]he Commonwealth is to respond to [the Rehearing Papers] on or before September 22,

2016" (the "Initial Rehearing Order").

542.    On or about September 13, 2016, KELLER approached the RELATOR in the computer

lab of the law library of BCLS and asked the RELATOR to visit her office.

543.    The Initial Rehearing Order caused one or more the NAMED ASSOCIATES to seek the

removal of Gary Katzmann and/or the inclusion of Eric NEYMAN from the

Massachusetts Appeals Court due to fear of an unfavorable ruling in the appeal of the

dismissal of the *Qui Tam* Action, fear of disclosures concerning wrongdoing associated

with the dismissal of the *Qui Tam* Action, and/or fear of disclosures concerning non-

enforcement of the CST.*

544.    On or about September 14, 2016, one or more of the NAMED ASSOCIATES and/or one

or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE

COMMONWEALTH called or otherwise communicated with one or more federal

employees located the White House and/or with one or more employees of the executive

branch of the United States to discuss and/or urge the signing of the commission to be a judge on the U.S. Court of International Trade for Gary Katzmann so as to provide a pretext and/or opportunity for NEYMAN to rule on the Rehearing Papers.*

545. After Gary Katzmann was confirmed by the United States Senate to be a judge on the U.S. Court of International Trade, OBAMA waited more than one hundred days to sign the commission for Gary Katzmann to be a judge of the U.S. Court of International Trade in order to induce or cause Gary Katzmann to rule against the RELATOR in the appeal of the dismissal of the *Qui Tam* Action.*

546. On or about September 15, 2016, OBAMA signed the commission for Gary Katzmann to be a judge of the U.S. Court of International Trade.

547. On or about September 15, 2016, BARRON became aware that OBAMA signed the commission for Gary Katzmann to be a judge of the U.S. Court of International Trade.

548. On or about September 15, 2016, Gary Katzmann resigned as a justice of the Massachusetts Appeals Court.

549. OBAMA signed the commission for Gary Katzmann to be a judge of the U.S. Court of International Trade on or about September 15, 2016 in order to remove Gary Katzmann from the panel deciding the Rehearing Papers and/or to provide a pretext and/or opportunity for NEYMAN to rule on the Rehearing Papers.*

550. Jennifer Choe Groves received her commission for a judgeship on the U.S. Court of International Trade from OBAMA within two days while Gary Katzmann received his commission for a judgeship on the U.S. Court of International Trade from OBAMA after more than 100 days had elapsed.

551. Jennifer Choe Groves and Gary Katzmann were nominated by OBAMA and confirmed by the United States Senate on the same days – July 30, 2015 and June 8, 2016, respectively – to be judges on the U.S. Court of International Trade.

552. On or about September 15, 2016, NEYMAN joined a new Massachusetts Appeals Court panel reviewing the Rehearing Papers.

553. Rule 27 of the Massachusetts Rules of Appellate Procedure holds in part that "[a] petition for rehearing shall be decided by the quorum or panel which decided the appeal."

554. On or about September 22, 2016, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH filed an omnibus opposition memorandum (the "Omnibus Opposition") in response to the Massachusetts Appeals Court order dated September 12, 2016.

555. HEALEY and FEINER appear on the signature line of the Omnibus Opposition.

556. FEINER sent the Omnibus Opposition to the RELATOR through the United States Postal Service on or about September 22, 2016.

557. In the Omnibus Opposition, HEALEY and FEINER did not provide any additional information concerning the acceptance of money from the Equitable Sharing Program during federal Fiscal Years 2014 and 2015 beyond what the RELATOR asserted in the Rehearing Papers.

558. In the Omnibus Opposition, HEALEY and/or FEINER stated that "[t]he Equitable Sharing Program *described by Relator* does not compromise the Attorney General's Office" (emphasis added).

559. In the Omnibus Opposition, HEALEY and/or FEINER stated that "here, there is nothing about the Equitable Sharing Program *described by Relator* that compromises the

Attorney General's Office from responsibly and impartially exercising the ample discretion afforded by the Legislature to dismiss *qui tam* actions and exercise prosecutorial discretion" (emphasis added).

560. In the Omnibus Opposition, HEALEY and/or FEINER did not state that, as to the *qui tam* action, there was or is nothing about the Equitable Sharing Program that *in fact* compromises or compromised the Attorney General's Office from responsibly and impartially exercising the discretion afforded by the Massachusetts Legislature to dismiss *qui tam* actions and exercise prosecutorial discretion.

561. Equitable Sharing Program payments from the U.S. Department of Justice to law enforcement agencies in the Commonwealth of Massachusetts were contingent, expressly or impliedly,- upon the non-enforcement of the CST during federal Fiscal Years 2014 and 2015.*

562. The Attorney General's acceptance of payments from the Equitable Sharing Program during federal Fiscal Years 2014 and 2015 was, in whole or in part, in exchange for the non-prosecution of the *Qui Tam* Defendants pursuant to the CST in connection with the *Qui Tam* Action.*

563. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH's acceptance of money and/or property from the Equitable Sharing Program during federal Fiscal Year 2014 was in exchange for the non-prosecution of the *Qui Tam* Defendants pursuant to the CST in connection with the *Qui Tam* Action.*.

564. One or more of the NAMED ASSOCIATES and/or one or more employees of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH accepted money and/or property from the Equitable Sharing Program in exchange for the non-

prosecution of the *Qui Tam* Defendants pursuant to the CST in connection with the *Qui Tam* Action.*

565. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH was and is required to keep payments accepted from the Equitable Sharing Program (the "Segregated Funds") segregated from any state taxpayer funds and/or funds from the state treasury of the Commonwealth.

566. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH keeps the Segregated Funds in the EQUITABLE SHARING ACCOUNTS.*

567. DOJ and/or U.S. Department of Treasury ("Treasury") regulations as well as agreements with DOJ and/or Treasury govern the custody and expenditure of the Equitable Sharing Program payments by each and every law enforcement agency of the Commonwealth.

568. No person from the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, individually or in his or her respective official capacity, notified SUFFOLK SUPERIOR COURT, the Massachusetts Appeals Court, or any federal court of the acceptance of money from the Equitable Sharing Program in the years 2014, 2015, and 2016 by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH and/or one or more employees of that Office.

569. The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH withheld and/or continues to withhold public records as to the Equitable Sharing Program payments because the spending or disbursement of such payments, or a portion thereof, violated one or more state laws, federal laws, federal regulations, and/or the Rules of Professional Conduct of the Commonwealth.*

570.   The Commissioner did not direct DOR to abstain from enforcing the CST before the
commencement of the *Qui Tam* Action as stated in writing by the OFFICE OF THE
ATTORNEY GENERAL OF THE COMMONWEALTH.*

571.   In his appeal of the dismissal of the First Federal Action to the U.S. Court of Appeals for
the First Circuit, the RELATOR submitted papers with his brief that had previously been
filed in the First Federal Action and which stated that it would be "*misleading*" to
characterize any of the RELATOR's alleged injuries as deriving from the opioid crisis
(emphasis as in original).

572.   On or about September 28, 2016, the U.S. Court of Appeals for the First Circuit entered a
judgment (the "First Circuit Judgment") in the RELATOR's appeal of the dismissal of
the First Federal Action dismissing both of the RELATOR's two claims for lack of
standing.

573.   The First Circuit Judgment found that "Chawla is of the view that the state's policy of
non-enforcement is wrongheaded in light of the opioid crisis, but, as the district court
concluded, this contention does not create a legally-cognizable injury remediable with
declaratory relief."

574.   The fact that NEYMAN was ruling on the appeal of the dismissal of the *Qui Tam* Action
was revealed for the first time by the Massachusetts Appeals Court on or about October
6, 2016.

575.   On or about October 6, 2016, in an order signed by Justices Judd CARHART and C.
Jeffrey KINDER, as well as NEYMAN, the Massachusetts Appeals Court denied the
RELATOR's petition for rehearing in the appeal of the dismissal of the *Qui Tam* Action.

576. On or about October 15, 2016, HEALEY promoted CRAFTS to a position with higher pay and/or a more senior title.*

577. On or about October 15, 2016, HEALEY promoted CRAFTS to Deputy Chief of the False Claims Division.*

578. As an attorney for the Commonwealth, each attorney from the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH always have a duty to disclose any conflict of interest and/or false statement of fact or law made by him or her or the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH in appearing before any state or federal court in connection with any litigation in Massachusetts.

579. HEALEY promoted CRAFTS to Deputy Chief of the False Claims Division in exchange and/or as a reward for CRAFTS's silence regarding one or more conflicts of interest and/or violations of law in connection with the acceptance of Equitable Sharing Program funds and/or the disposition of the *Qui Tam* Action.*

580. HEALEY promoted CRAFTS to Deputy Chief of the False Claims Division in exchange and/or as a reward for CRAFTS's association with the ENTERPRISE, including acts taken in connection with the RELATOR's litigation.*

581. On or about November 6, 2016, SIMAS met with ROUGEAU and/or MAFFEI in or around 885 CENTRE STREET.*

582. On or about December 6, 2016, the RELATOR filed a motion for recusal of NEYMAN from participation in the RELATOR's appeal of the dismissal of the *Qui Tam* Action.

583. On or about December 13, 2016, in an order (the "NEYMAN Recusal Denial") signed by Justice Judd CARHART, Justice C. Jeffrey KINDER, and Justice NEYMAN, the

Massachusetts Appeals Court denied the RELATOR's motion for recusal of NEYMAN from participation in the RELATOR's appeal of the dismissal of the *Qui Tam* Action.

584.   The NEYMAN Recusal Denial included no statement at all beyond denial of the motion for recusal of NEYMAN.[11]

585.   On or about January 15, 2017, the RELATOR electronically transferred approximately $26,992 to BOSTON COLLEGE and BOSTON COLLEGE BANK ACCOUNTS using a BOSTON COLLEGE electronic payment website.

586.   On or about January 15, 2017, HEALEY hired Mary Strother of WILMERHALE for a position at the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

587.   SQUIRES-LEE taught a course during the spring 2017 semester at BCLS at 885 CENTRE STREET.

588.   SARAH HERLIHY was the teaching assistant for SQUIRES-LEE when SQUIRES-LEE taught a course during the spring 2017 semester at BCLS at 885 CENTRE STREET.

589.   BOSTON COLLEGE provided SARAH HERLIHY with money through one or more teaching assistant positions to carry on the affairs of the ENTERPRISE during 2017 and/or 2018.*

590.   SQUIRES-LEE was aware or became aware of some or all of the RELATOR's litigation while teaching at BCLS at 885 CENTRE STREET during the spring 2017 semester.*

---

[11] When faced with a question of his capacity to rule fairly, the judge must first consult his own emotions and conscience. If he passes the internal test of freedom from disabling prejudice, he must next attempt an objective appraisal of whether this is a proceeding in which his impartiality might reasonably be questioned. Commonwealth v. Eddington, 71 Mass. App. Ct. 138, 143 (2008).

591. On or about February 1, 2017, the U.S. Department of Justice published on its official website the statistics for federal Fiscal Year 2016 Equitable Sharing Program payments of cash and sale proceeds to law enforcement agencies of the Commonwealth of Massachusetts.

592. On or about March 1, 2017, the RELATOR brought a civil action in the nature of mandamus (the "Mandamus Action") in the Supreme Judicial Court for Suffolk County seeking to compel the recusal of Eric NEYMAN from the appeal of the dismissal of the *Qui Tam* Action in the Massachusetts Appeals Court.

593. On or about April 20, 2017, the RELATOR released an app on the Apple App Store, Omnibus U.S. Code ("Omnibus U.S. Code"), by and through the company, Omnibus, LLC.

594. Omnibus, LLC is organized under the laws of the State of New Hampshire.

595. ROUGEAU became aware that Omnibus, LLC was registered in the State of New Hampshire in or around the time that the RELATOR released Omnibus U.S. Code.*

596. On or about April 25, 2017, HEALEY attended and participated in an event on the Newton, MA campus of Boston College Law School that was moderated and/or organized in whole or in part by CASSIDY.

597. On or about April 28, 2017, HEALEY, CRAFTS, and WALKER represented in writing (the "First SJC Statement") to the Supreme Judicial Court for Suffolk County that, "[a]fter Mullins, the DOR resolved internally not to enforce compliance with the CST in light of the serious concerns the case raised for both the Commonwealth's administration of criminal justice through its criminal prosecutors and the constitutional rights of drug defendants."

598.  On or about April 28, 2017, HEALEY, CRAFTS, and/or WALKER represented in

writing (the "Second SJC Statement") to the Supreme Judicial Court for Suffolk County

that

> Chawla makes much of the closeness of the amount the Attorney General
> allegedly received from the 'Equitable Sharing' program in fiscal years
> 2014 and 2015 ($360,755) and the amount to which he claims entitlement
> pursuant to the Gonzalez Qui Tam action ($360,000, *see* Amended
> Complaint ¶ 32). *See, e.g.,* Amended Complaint ¶¶ 53, 84. *However, the
> closeness of the two numbers appears to be purely coincidental.*
> (emphasis added).

599.  On or about April 28, 2017, WALKER mailed papers (the "SJC Papers") containing the

First SJC Statement and the Second SJC Statement by United States Postal Service to the

RELATOR.

600.  HEALEY, CRAFTS, and WALKER appear on the signature line of the SJC Papers.

601.  The SJC Papers did not discuss the Equitable Sharing Program beyond the First SJC

Statement and the Second SJC Statement.

602.  The SJC Papers included over one hundred pages of exhibits.

603.  The SJC Papers did not include the Judicial Notice Motion.

604.  HEALEY, CRAFTS, and/or WALKER chose not to include the Judicial Notice Motion

in order to hide, conceal, and/or obscure the acceptance of money from the Equitable

Sharing Program by the OFFICE OF THE ATTORNEY GENERAL OF THE

COMMONWEALTH.*

605.  On or about May 1, 2017, ROUGEAU hired or offered to hire ORTIZ as a visiting

professor for the fall 2017 semester at Boston College Law School.

606.  ROUGEAU hired or offered to hire ORTIZ as a visiting professor for the fall 2017

semester at Boston College Law School in exchange and/or as a reward for ORTIZ's

participation in the ENTERPRISE and/or for ORTIZ's actions in connection with the
RELATOR's litigation during ORTIZ's tenure as U.S. Attorney for the District of
Massachusetts.*

607. On or about May 7, 2017, OBAMA travelled from 2446 BELMONT ROAD to an event
in or around Boston, Massachusetts either directly or with one or more intervening stops
at other locations.

608. On or about May 7, 2017, OBAMA and HEALEY attended the same event in or around
Boston, Massachusetts.

609. OBAMA spent and/or transferred money from OBAMA FOUNDATION ACCOUNTS
to carry on the affairs of the ENTERPRISE while OBAMA was visiting Boston,
Massachusetts on or about May 7, 2017.*

610. On or about May 17, 2017, WOLOHOJIAN and NEYMAN attended and provided
remarks at a networking reception in or around Boston, Massachusetts that was organized
for alumni, parents, and friends of Phillips Academy Andover and that was publicly
advertised as a "Law Reception with Gabrielle Wolohojian '78 & Eric Neyman '86,
Associate Justices of the Massachusetts Appeals Court."

611. During the summer of 2017, LAMPERT was employed by the law firm,
WILMERHALE.

612. As a paid employee of WILMERHALE, LAMPERT assisted in the communication of
information between BOSTON COLLEGE, WILMERHALE, HEALEY, and/or
ROUGEAU.*

613. On or about May 26, 2017, the RELATOR delivered by hand a request pursuant to the
Massachusetts Public Records Law (Mass.Gen.Laws ch. 66 § 10) to the OFFICE OF

THE ATTORNEY GENERAL OF THE COMMONWEALTH seeking "[a]ll records pertaining to Equitable Sharing Program payments accepted by the Attorney General in fiscal years 2012, 2013, 2014, 2015, and 2016" (altogether, the "Equitable Sharing Records Request").

614.    On or about June 7, 2017, the RELATOR mailed a request (the "DOR Request") to the Massachusetts Department of Revenue pursuant to the Massachusetts Public Records Law seeking "[a]ny directives, memoranda, or other records pertaining to DOR policies and procedures regarding enforcement of G. L. c. 64K."

615.    On or about June 12, 2017, the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, by and through TARROW, responded by letter (the "First TARROW Letter") to the Equitable Sharing Records Request and stated that "[w]e expect to be able to provide a further response accounting for any such records on or before June 19."

616.    On or about June 15, 2017, the RELATOR mailed a request pursuant to the Freedom of Information Act (5 U.S.C. § 552) to the U.S. Department of Justice seeking records, including, but not limited to, records pertaining to payments made under the Equitable Sharing Program by DOJ to the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH (altogether, the "June 2017 FOIA") during federal Fiscal Years 2014 and 2015.

617.    The RELATOR has not received any records in response to the June 2017 FOIA.

618.    On or about June 19, 2017, TARROW sent a follow-up letter (the "Second TARROW Letter") to the First TARROW Letter to the RELATOR declining to provide "[a]ll records pertaining to Equitable Sharing Program payments accepted by the Attorney

General in fiscal years 2012, 2013, 2014, 2015, and 2016," because, according to TARROW, "[t]o have provided you with the underlying payment records would have been very time consuming."

619.   In the Second TARROW Letter, TARROW stated that, instead of providing the RELATOR with the requested public records, that the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH would "provid[e] you with a record delineating the cases associated with the relevant payments under the [Equitable Sharing Program]" for a fee of $50.00.

620.   In the Second TARROW Letter, TARROW stated that, "[o]n June 12, we indicated that we were still the process of searching for records that may be responsive to your request and subject to disclosure under the public records law," and that "[t]oday, we have completed that process and enclose such a record, one (1) page in length."

621.   The one-page record (the "One-Page Record") enclosed with the Second TARROW Letter was created or produced on or after May 30, 2017.*

622.   The public records sought by or that could be produced in connection with the Equitable Sharing Records Request constitute *prima facie* evidence of one or more crimes under state and/or federal law.*

623.   TARROW mailed the One-Page Record in order to hinder, delay, or otherwise prevent the RELATOR from obtaining the public records sought in the Equitable Sharing Records Request.*

624.   ABBENE, as an assistant dean at BCLS at 885 CENTRE STREET, reported to and/or reports to ROUGEAU during the time when the RELATOR was a student at BCLS at 885 CENTRE STREET.

625.  ABBENE was a subordinate of ROUGEAU during the time when the RELATOR was a student at BCLS at 885 CENTRE STREET.

626.  On or about June 25, 2017, the RELATOR sent an email from the BC Email Account to ABBENE questioning whether the RELATOR could be a visiting student at a different law school.

627.  On or about June 26, 2017, ABBENE sent an email to the BC Email Account stating that allowance of visiting student status was granted under "very special circumstances."

628.  On or about June 26, 2017, the RELATOR sent an email from the BC Email Account to ABBENE stating that he was interested in studying "marijuana regulation" in Colorado.

629.  On or about June 26, 2017, ABBENE sent an email to the BC Email Account stating that the study of "marijuana regulation" did not qualify for visiting student status.

630.  On or about June 27, 2017, the RELATOR brought a civil action pursuant to the Massachusetts Public Records Law (the "Public Records Action") in SUFFOLK SUPERIOR COURT against the Massachusetts Department of Revenue and Maura HEALEY, in her official capacity as Attorney General of the Commonwealth, wherein the RELATOR sought to compel production of public records concerning the CST and the Equitable Sharing Program.

631.  Up to and including the day on which the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH filed a notice of appearance in the Public Records Action, the RELATOR received no public records within the meaning of the Massachusetts Public Records Law from the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH or any employee thereof in response to the Equitable Sharing Records Request excluding the One-Page Record.

632.   On or about August 4, 2017, in the Supreme Court of the United States, the RELATOR

filed a petition for a writ of certiorari to the U.S. Court of Appeals for the First Circuit in

which the RELATOR asserted

> Absent this Court's intervention, presentation of the payments in question
> to the District Court through a motion pursuant to Fed. R. Civ. P. 60(b)
> would likely be a fool's errand in view of Petitioner's continued status as a
> *pro se* litigant and the risk of further issues arising from application of the
> liberal construction rule.

633.   On or about August 9, 2017, the RELATOR electronically transferred approximately

$27,813 to BOSTON COLLEGE and BOSTON COLLEGE BANK ACCOUNTS using a

BOSTON COLLEGE electronic payment website.

634.   On or about August 21, 2017, ORTIZ began teaching as a visiting professor at BCLS at

885 CENTRE STREET.

635.   During the fall 2017 semester, the RELATOR was a student in a trial practice course (the

"Trial Practice Course") taught by CURTIN.

636.   MALONEY was a student in the Trial Practice Course.

637.   CURTIN and MALONEY discussed the RELATOR and/or the RELATOR's litigation

prior to or after the weekly meeting of the Trial Practice Course.*

638.   On or about October 2, 2017, the RELATOR filed a lawsuit in SUFFOLK SUPERIOR

COURT (the "Parallel State Case") against the Commonwealth of Massachusetts and

Maura HEALEY, in her official capacity as the Attorney General of the Commonwealth,

wherein the RELATOR alleged that one or more individuals in the OFFICE OF THE

ATTORNEY GENERAL OF THE COMMONWEALTH stole the RELATOR's

whistleblower bounty in the *Qui Tam* Action by accepting money from the Equitable

Sharing Program in exchange for the non-prosecution of the *Qui Tam* Defendants.

639.    GILES was and/or is the judge in the Parallel State Case.

640.    GILES was and/or is a friend of HEALEY and/or WOLOHOJIAN.

641.    WOLOHOJIAN was and/or is a friend of KATZMANN.

642.    GILES was a colleague of KATZMANN on a bar association journal's board of editors.

643.    GILES was and/or is a colleague of WOLOHIJIAN on a bar association journal's board
        of editors.

644.    On or about October 3, 2017, TARROW and/or one or more employees of the OFFICE
        OF THE ATTORNEY GENERAL OF THE COMMONWEALTH mailed the
        RELATOR a letter and 231 pages of public records (the "October 3 Disclosure")
        responsive to the Equitable Sharing Records Request.

645.    TARROW waited until October 3, 2017 to mail the October 3 Disclosure because of her
        belief that the statute of limitations[12] had run to its conclusion on any claim or claims
        made against the OFFICE OF THE ATTORNEY GENERAL OF THE
        COMMONWEALTH and/or one or more employees of that Office for not prosecuting
        the *Qui Tam* Defendants.*

646.    On or about November 10, 2017, the RELATOR sent an email from the BC Email
        Account to ABBENE stating that the RELATOR was engaged in numerous cases and
        that moving to a new jurisdiction, Colorado, was required.

647.    On or about November 10, 2017, ABBENE sent an email to the BC Email Account
        stating that ABBENE would discuss the request with ROUGEAU.

---

[12] The statute of limitations runs from the date when the RELATOR found out about or should
have found out about the wrongful nature of the dismissal of the *Qui Tam* Action. That date is
January 27, 2016, which is the date that DOJ published Equitable Sharing Program statistics for
federal fiscal year 2015.

648.  On or about November 15, 2017, SOROKIN attended and spoke at an event on the Newton, MA campus of BCLS concerning the opioid epidemic that was organized in part by CASSIDY.

649.  On or about November 15, 2017, CASSIDY called SOROKIN a "friend of the law school" during an event on the Newton, MA campus of BCLS concerning the opioid epidemic.

650.  SOROKIN was aware of the RELATOR's identity during the November 15, 2017 Event at BCLS at 885 CENTRE STREET where SOROKIN and the RELATOR were in attendance.*

651.  SOROKIN's spouse was and/or is an adjunct professor at or paid by BOSTON COLLEGE.*

652.  On or about November 15, 2017, one or more employees of BOSTON COLLEGE directly or indirectly offered or promised to SOROKIN that BOSTON COLLEGE would create, establish, continue, provide a raise in pay for, and/or resume a teaching position for SOROKIN's spouse in order to influence one or more judicial decisions by SOROKIN in any future proceeding involving the RELATOR.*

653.  On or about November 15, 2017, SOROKIN agreed to be influenced by one or more employees of BOSTON COLLEGE in any future proceeding involving the RELATOR in exchange or in return for Boston College creating, establishing, continuing, providing a raise in pay for, and/or resuming a teaching position for SOROKIN's spouse.*

654.  The RELATOR attended all or part of the event in which SOROKIN participated on or about November 15, 2017 at BCLS at 885 CENTRE STREET.

655. SOROKIN and SOROKIN's spouse communicated at 100 DAVIS AVENUE regarding SOROKIN's agreement with BOSTON COLLEGE involving compensation to SOROKIN's spouse from BOSTON COLLEGE.*

656. On or about November 20, 2017, ABBENE sent an email to the BC Email Account stating that ROUGEAU and ABBENE had discussed and denied the RELATOR's request.

657. On or about November 28, 2017, the RELATOR and CURTIN shook hands, during which handshake CURTIN turned his head and looked in a different direction so as to avoid looking at the RELATOR.

658. On or about November 30, 2017, the RELATOR sent an email (the "FBI Email") from the BC Email Account in which he stated that "I'm fairly certain there was/is some sort of FBI intelligence operation going on against me" and that "[l]ots of weird shit is going down."

659. On or about November 30, 2017, within one hour of sending the FBI Email, the RELATOR encountered ROUGEAU (the "ROUGEAU Stairwell Encounter") in one of the stairwells at the Newton, Massachusetts campus of BCLS.

660. During the ROUGEAU Stairwell Encounter, ROUGEAU appeared to be waiting for the RELATOR and the RELATOR walked away from ROUGEAU with neither party saying anything to the other party.

661. ROUGEAU read the FBI Email in real time or shortly after the FBI Email was sent and was prompted to initiate the ROUGEAU Stairwell Encounter as a consequence of the FBI Email.*

662.  ROUGEAU was informed of the FBI Email and decided to initiate the ROUGEAU
Stairwell Encounter as a consequence of the FBI Email.*

663.  On or about December 7, 2017, the RELATOR sent an email from the BC Email
Account with the subject line, "I FUCKING TOLD YOU," in which the RELATOR
stated that "THE JUDGE SELECTION PROCESS IS NOT RANDOM."

664.  On or about December 15, 2017, the RELATOR sent an email from the BC Email
Account to ABBENE stating that the RELATOR had submitted a visiting application to
Sturm College of Law at the University of Denver and that the RELATOR was
requesting permission to visit at that institution from BCLS.

665.  On or about December 18, 2017, ABBENE sent an email to the BC Email Account
denying the RELATOR's request to be a visiting student at Sturm College of Law at the
University of Denver.

666.  On or about December 20, 2017, the RELATOR sent an email (the "JOSEPH HERLIHY
Email") from the BC Email Account to JOSEPH HERLIHY in which the RELATOR
informed JOSEPH HERLIHY regarding his repeated attempts to be a visiting student in
Colorado and potential litigation as a consequence of the conduct of BCLS.

667.  JOSEPH HERLIHY did not respond to the JOSEPH HERLIHY Email in any email to the
BC Email Account.

668.  On or about December 23, 2017, the RELATOR electronically submitted a "Boston
College Bias-Related Incident Report Form" (the "Anti-Asian Report") to one or more
employees of BOSTON COLLEGE.

669.  The Anti-Asian Report stated that "[a]t one point during his speech, the guest speaker
said something to the effect that observing cultural niceties with Asians was not as

important, because 1) no one really cares what Asians think; and 2) Asians won't stand up for themselves."

670.  The Anti-Asian Report stated that "[a]lthough I do not remember the precise words chosen by the guest speaker, I know that I confirmed his the [sic] bias of his comments both in real time and after the class with at least two students."

671.  On or about December 27, 2017, the RELATOR sent an email (the "Farewell Email") to multiple students and multiple faculty members at BCLS at 885 CENTRE STREET with the subject line, "Farewell," in which the RELATOR stated that "Monday of last week was my final day at Boston College Law School," that "I am currently a litigant in the Supreme Judicial Court," and that "I am moving to a different jurisdiction in the new year to avoid a conflict."

672.  Excluding ABBENE, no faculty member responded to the Farewell Email.

673.  The RELATOR did not send the Farewell Email to LAMPERT or BRIAN DURKIN.

674.  On or about January 2, 2018, the RELATOR filed a motion for appointment of a special prosecutor (the "Special Prosecutor Motion") in the Mandamus Action.

675.  There were no docket entries in the Mandamus Action for approximately 82 days until the Special Prosecutor Motion.

676.  In the Special Prosecutor Motion, the RELATOR alleged that there was reasonable suspicion of a violation of Mass.Gen.Laws ch. 268 § 36 by one or more individuals in the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH.

677.  On or about January 11, 2018, the RELATOR sent a letter (the "93A Demand Letter") by facsimile and/or first class mail to ROUGEAU at 885 CENTRE STREET.

678.    On or about January 11, 2018, a copy of the 93A Demand Letter was sent to the Federal
        Trade Commission and the U.S. Department of Justice.

679.    The 93A Demand Letter, a copy of which was sent to DOJ, raised questions about and/or
        alleged a potential violation of law by BCLS through price fixing in violation of the
        Sherman Antitrust Act.[13]

680.    ROUGEAU was made aware that the 93A Demand Letter was sent to one or more
        federal law enforcement agencies and/or officers by the contents of the 93A Demand
        Letter.

681.    Between approximately January 11, 2018 and January 22, 2018, the RELATOR
        corresponded by email with Abbene (the "January Correspondence").

682.    In the January Correspondence, Abbene repeatedly communicated that BCLS at 885
        CENTRE STREET denied the RELATOR's request to visit at a different law school.

683.    In the January Correspondence or in any previous correspondence with the RELATOR,
        Abbene did not mention that one or more faculty members at BCLS at 885 CENTRE
        STREET had an interest and/or was serving in some capacity as an attorney in any of the
        cases in which the RELATOR was a party.

684.    In the January Correspondence or in any previous correspondence with the RELATOR,
        Abbene never mentioned that one or more faculty members at BCLS at 885 CENTRE
        STREET had been communicating and/or was continuing to communicate Privileged
        Information obtained from the BC Email Account or the Legal Research Accounts.

---

[13] Sending the 93A Demand Letter constituted the provision to a law enforcement officer of
truthful information relating to the commission or possible commission of a federal offense,
which is an element in the obstruction of justice statutes.  See, e.g., 18 U.S.C. 1513.

685. On or about January 23, 2018, the RELATOR communicated to Abbene that he would return to Boston College Law School at a reduced load of credits for the full rate of tuition.

686. On or about January 24, 2018, the RELATOR electronically transferred approximately $28,205 to BOSTON COLLEGE and BOSTON COLLEGE BANK ACCOUNTS using a BOSTON COLLEGE electronic payment website.

687. On or about January 24, 2018, after having missed approximately one week of classes, the RELATOR attended his first class of the spring 2018 semester at BCLS at 885 CENTRE STREET.

688. On or about January 24, 2018, the RELATOR and BRIAN DURKIN attended an advanced constitutional law seminar concerning the administration of President Donald J. Trump (the "Trump Seminar") which met once per week for approximately one to two hours on each Wednesday of the semester.

689. The first class that the RELATOR attended during the spring 2018 semester at BCLS at 885 CENTRE STREET was the Trump Seminar.

690. The professor teaching the Trump Seminar (the "Trump Seminar Professor") sat with his back facing the entrance to the classroom in each class that the RELATOR attended.

691. In each class of the Trump Seminar that the RELATOR attended, there were approximately five feet of space between where the Trump Seminar Professor sat and the door for entering the classroom.

692. Because of where the Trump Seminar Professor sat in each class attended by the RELATOR, there was a space behind the Trump Seminar Professor with the result that the Trump Seminar Professor could not see unless he turned around to look at that space.

693.   On or about January 24, 2018 during the Trump Seminar, the RELATOR sat next to the Trump Seminar Professor and was located in front of and to the left of the Trump Seminar Professor.

694.   ARCHER sat directly next to the RELATOR on the RELATOR's left during the Trump Seminar on or about January 24, 2018.

695.   The RELATOR and BRIAN DURKIN did not speak or otherwise interact during the Trump Seminar on or about January 24, 2018.

696.   On or about January 29, 2018, the U.S. Department of Justice published on its official website the statistics for federal Fiscal Year 2017 Equitable Sharing Program payments of cash and sale proceeds to law enforcement agencies of the Commonwealth of Massachusetts.

697.   On or about January 31, 2018, the RELATOR and BRIAN DURKIN attended the Trump Seminar.

698.   On or about January 31, 2018 during the Trump Seminar, the RELATOR sat next to the Trump Seminar Professor and was located in front of and to the left of the Trump Seminar Professor.

699.   ARCHER sat directly next to the RELATOR on the RELATOR's left during the Trump Seminar on or about January 31, 2018.

700.   The RELATOR and BRIAN DURKIN did not speak or otherwise interact during the Trump Seminar on or about January 31, 2018.

701.   On or about February 5, 2018, ROUGEAU sent by first class mail a response to the 93A Demand Letter (the "93A Response").

702.   In the 93A Response, ROUGEAU denied that any of the provisions of Mass.Gen.Laws ch. 93A applied to Boston College Law School's denial of the RELATOR's request for permission to be a visiting student at Sturm College of Law at the University of Denver.

703.   In the 93A Response, ROUGEAU did not mention the Sherman Antitrust Act or any other antitrust law.

704.   On or about February 7, 2018, the RELATOR and BRIAN DURKIN attended the Trump Seminar.

705.   The RELATOR and BRIAN DURKIN did not speak or otherwise interact during the Trump Seminar on or about February 7, 2018.

706.   On or about February 7, 2018 during the Trump Seminar, the RELATOR sat next to the Trump Seminar Professor and was located in front of and to the left of the Trump Seminar Professor.

707.   ARCHER sat directly next to the RELATOR on the RELATOR's left during the Trump Seminar on or about February 7, 2018, if ARCHER was present for class.

708.   On on about February 7, 2018, the Mandamus Action was listed as under advisement by LOWY of the Supreme Judicial Court of the Commonwealth.

709.   On or about February 7, 2018, HEALEY approved a deal (the "Art Deal") in which the Berkshire Art Museum in Berkshire County, Massachusetts could sell up to $55 million in art using HEALEY's authority as Attorney General of the Commonwealth.

710.   One or more WILMERHALE clients accepted money from or in connection with the Art Deal.

711.   WILMERHALE accepted multiple payments from or in connection with the Art Deal.

712. On or about February 13, 2018, WALKER, on behalf of the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH, submitted an opposition to the Special Prosecutor Motion (the "Special Prosecutor Opposition").

713. The Special Prosecutor Opposition did not deny that one or more individuals in the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH accepted something of value in exchange for the non-prosecution of the *Qui Tam* Defendants.

714. The Special Prosecutor Opposition did not deny that one or more individuals in the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH personally benefitted from that Office's acceptance of payments from the Equitable Sharing Program.

715. On or about February 14, 2018, the RELATOR and BRIAN DURKIN attended the Trump Seminar.

716. On or about February 14, 2018 during the Trump Seminar, the RELATOR sat next to the Trump Seminar Professor and was located in front of and to the left of the Trump Seminar Professor.

717. ARCHER sat directly next to the RELATOR on the RELATOR's left during the Trump Seminar on or about February 14, 2018, if ARCHER was present for class.

718. The RELATOR and BRIAN DURKIN did not speak or otherwise interact during the trump Seminar on or about February 14, 2018.

719. On or about February 15, 2018, LOWY entered a judgment (the "LOWY Judgment") dismissing the Mandamus Action.

720. On or about February 15, 2018, LOWY communicated with LAMPERT about the LOWY Judgment or otherwise caused LAMPERT to become aware of the LOWY Judgment.*

721. On or about February 15, 2018, an employee of the Supreme Judicial Court of the Commonwealth and/or WILMERHALE communicated with LAMPERT about the LOWY Judgment or otherwise caused LAMPERT to become aware of the LOWY Judgment.*

722. The Supreme Judicial Court for the Commonwealth of Massachusetts, the Supreme Judicial Court for the County of Suffolk, and the Massachusetts Appeals Court provide a website located at http://www.ma-appellatecourts.org (the "Public Case Website") that provides public case information concerning cases before those courts.

723. The Public Case Website updates after approximately 9:00 PM Eastern Standard Time with the latest case information inputted on that day.

724. The Public Case Website does not provide the latest case information for a day on which the courts are open until or after 9:00 PM.

725. The only ways to obtain public case information entered on a specific day concerning the Supreme Judicial Court for the Commonwealth of Massachusetts, the Supreme Judicial Court for the County of Suffolk, and/or the Massachusetts Appeals Court are to 1) visit the relevant court in person; 2) call the relevant court; 3) communicate with someone with knowledge; or 4) visit the Public Case Website after approximately 9:00 PM.

726. On or about February 15, 2018, the RELATOR arrived for a civil litigation class (the "Judgment Class") that was taught by SAVERY at approximately 5:00 PM.

727. SAVERY is a former Assistant United States Attorney for the District of Massachusetts who served under ORTIZ.

728. Before and during the Judgment Class, the RELATOR had no knowledge that the LOWY Judgment had been entered earlier that day.

729. LAMPERT was present in the Judgment Class.

730. During some portion or all of the years 2017 and/or 2018, LAMPERT was an employee of WILMERHALE.*

731. SAVERY became aware of the LOWY Judgment prior to the Judgment Class.

732. Prior to the Judgment Class, SAVERY became aware of the 93A Letter.*

733. LAMPERT became aware of the LOWY Judgment prior to the Judgment Class.

734. The RELATOR first learned of the LOWY Judgment at some time after approximately 9:00 PM on February 15, 2018 when the RELATOR checked the Public Case Website.

735. During the Judgment Class and excluding the RELATOR, multiple students attending the Judgment Class were aware of the LOWY Judgment.

736. On or about February 15, 2018, one or more of the NAMED ASSOCIATES communicated information concerning the LOWY Judgment among the students and/or faculty of BCLS in order to cause embarrassment to, harassment of, and/or retaliation against the RELATOR, to dissuade the RELATOR from pursuing further litigation and/or to cause damage to the RELATOR's reputation in the legal community.*

737. On or about February 19, 2018, the RELATOR faxed and mailed a notice of appeal of the LOWY Judgment to the Supreme Judicial Court for the County of Suffolk.

738. On or about February 21, 2018, the RELATOR and BRIAN DURKIN attended the Trump Seminar.

739.   On or about February 21, 2018 during the Trump Seminar, the RELATOR sat next to the Trump Seminar Professor and was located in front of and to the left of the Trump Seminar Professor.

740.   ARCHER sat directly next to the RELATOR on the RELATOR's left during the Trump Seminar on or about February 21, 2018, if ARCHER was present for class.

741.   The RELATOR and BRIAN DURKIN did not speak or otherwise interact during the Trump Seminar on or about February 21, 2018.

742.   MAFFEI and ROUGEAU discussed the RELATOR and/or the RELATOR's litigation prior to one or more classes in which the RELATOR was a student and in which MAFFEI was an instructor.*

743.   MAFFEI and ROUGEAU discussed the RELATOR and/or the RELATOR's litigation by email.*

744.   On or about February 26, 2018 and during a class concerning Professional Responsibility (the "*Pro Se* Class") in which the RELATOR was a student, MAFFEI showed a video of a lawyer representing himself (the "*Pro Se* Lawyer Video") during oral argument before the Supreme Judicial Court for the Commonwealth.

745.   MALONEY was present at the *Pro Se* Class.

746.   During the *Pro Se* Class, MAFFEI mocked the lawyer shown in the *Pro Se* Lawyer Video.

747.   During the *Pro Se* Class, MAFFEI stated or attempted to state the adage, "A man who is his own lawyer has a fool for a client."

748.   MAFFEI's actions as to the *Pro Se* Lawyer Video were directed at the RELATOR.

749.   MAFFEI's actions as to the *Pro Se* Lawyer Video were intended to harass, dissuade, or otherwise influence the RELATOR into abandoning his appeal of the dismissal of the Mandamus Action and/or any plans to pursue litigation in federal court.

750.   On or about February 28, 2018, the RELATOR and BRIAN DURKIN attended the Trump Seminar.

751.   On or about February 28, 2018 during the Trump Seminar, the RELATOR sat next to the Trump Seminar Professor and was located in front of and to the left of the Trump Seminar Professor.

752.   ARCHER sat directly next to the RELATOR on the RELATOR's left during the Trump Seminar on or about February 28, 2018, if ARCHER was present for class.

753.   The RELATOR and BRIAN DURKIN did not speak or otherwise interact during the Trump Seminar on or about February 28, 2018.

754.   On or about March 14, 2018, the RELATOR and BRIAN DURKIN attended the Trump Seminar.

755.   On or about March 14, 2018 during the Trump Seminar, the RELATOR sat next to the Trump Seminar Professor and was located in front of and to the left of the Trump Seminar Professor.

756.   On or about March 14, 2018, while the RELATOR was waiting for the Trump Seminar to begin, BRIAN DURKIN arrived in the classroom in the area behind the Trump Seminar Professor.

757.   On or about March 14, 2018, immediately after arriving in the classroom for the Trump Seminar and standing behind where the Trump Seminar Professor was sitting, BRIAN DURKIN suddenly advanced towards where the RELATOR was sitting, glared directly

at the RELATOR with a menacing, crazed, and/or enraged look, and raised his arms approximately chest high while suddenly advancing in the direction of where the RELATOR was sitting (altogether, the "BRIAN DURKIN Assault").

758. During the BRIAN DURKIN Assault, BRIAN DURKIN appeared to the RELATOR to be positioning himself to throw a punch at the RELATOR.

759. During the BRIAN DURKIN Assault, BRIAN DURKIN appeared to the RELATOR to be positioning himself to lunge at the RELATOR.

760. SARAH HERLIHY witnessed the BRIAN DURKIN Assault.*

761. The RELATOR was shocked by the BRIAN DURKIN Assault.

762. The RELATOR was in a frightened state after the BRIAN DURKIN Assault.

763. After the BRIAN DURKIN Assault ended, ARCHER entered the classroom.

764. After the BRIAN DURKIN Assault ended, ARCHER glanced at the RELATOR upon entering the classroom and then walked in the direction of where BRIAN DURKIN was sitting or usually sat.

765. After the BRIAN DURKIN Assault ended, ARCHER did not sit next to the RELATOR.

766. Because of where he was sitting and because he did not turn around, the Trump Seminar Professor could not see the BRIAN DURKIN Assault.

767. The RELATOR was not notified in any manner beforehand by any person of the possibility or likelihood of the BRIAN DURKIN Assault.

768. BRIAN DURKIN did not communicate in any manner with the RELATOR during the year 2018 prior to the BRIAN DURKIN Assault.

769. The RELATOR missed all classes at BCLS at 885 CENTRE STREET after the day of the BRIAN DURKIN Assault Class until March 22, 2018.

770. On or about March 21, 2018, the RELATOR booked a stay at the Extended Stay America in Nashua, New Hampshire.

771. During March, April, and May 2018, the RELATOR booked numerous stays at the Extended Stay America in Nashua, New Hampshire ("ESA Nashua").

772. During March, April, and May 2018, the RELATOR stayed overnight at the ESA Nashua in excess of thirty non-consecutive nights.

773. On or about March 21, 2018, the RELATOR visited the U.S. District Court for the District of New Hampshire in Concord, New Hampshire (the "Initial Visit").

774. During the Initial Visit, the RELATOR questioned an employee of the Clerk's Office of the U.S. District Court for the District of New Hampshire regarding the manner in which judges are assigned to cases.

775. On or about March 22, 2018, the RELATOR filed a complaint against the Commissioner, the United States, and the U.S. Department of Justice in the U.S. District Court for the District of New Hampshire (the "Second Federal Action").

776. At the time of the filing of the Second Federal Action, SWEENEY was an attorney admitted to practice law in the State of New Hampshire.

777. On or about March 22, 2018, the RELATOR attended a class (the "March 22nd Class") at BCLS at 885 CENTRE STREET for the first time after the BRIAN DURKIN Assault Class.

778. On or about March 22, 2018, ROUGEAU was waiting for the RELATOR in the hallway in a building on the Newton, Massachusetts campus of BCLS as the RELATOR made his way to the March 22nd Class.

779.   On or about March 22, 2018, the RELATOR avoided ROUGEAU in the hallway in a
       building on the Newton, Massachusetts campus of BCLS as the RELATOR made his
       way to the March 22nd Class.

780.   ROUGEAU, SAVERY, and/or LAMPERT were aware of the BRIAN DURKIN Assault
       on March 22, 2018.*

781.   MAFFEI became aware that the RELATOR had filed the Second Federal Action on or
       about March 26, 2018.*

782.   On or about March 26, 2018 during the final class attended by the RELATOR at BCLS at
       885 CENTRE STREET (the "Final Class"), MAFFEI spoke to the class about how it was
       unusual for a junior person at a law firm to launch a lawsuit without proceeding through
       multiple layers of authority prior to filing the lawsuit.

783.   The March 22nd Class and the Final Class were the only classes attended by the
       RELATOR after the BRIAN DURKIN Assault Class.

784.   MALONEY was present at the Final Class.

785.   During the Final Class, MAFFEI used the word "deadly" in a discussion with the
       RELATOR.

786.   During the Final Class, MAFFEI asked a question (the "Deadly Question") to the
       RELATOR: "Was it deadly?"

787.   During the Final Class, MAFFEI issued a threat to the RELATOR by insinuating that the
       RELATOR was engaging in a "deadly" course of conduct and/or that the filing of the
       Second Federal Action was "deadly."

788.   During the Final Class, MAFFEI's use of the word, "deadly," bore no connection to any
       topic being discussed by MAFFEI, the RELATOR, or any other student in the classroom.

789.   On or about March 28, 2018, the RELATOR sent an email from the BC Email Account
       to ABBENE in which the RELATOR inquired about taking a leave of absence from
       BCLS.

790.   On or about March 28, 2018, ABBENE sent an email to the BC Email Account in which
       ABBENE encouraged the RELATOR to return to BCLS.

791.   On or about March 28, 2018, the RELATOR stopped regularly checking the BC Email
       Account.

792.   On or about April 4, 2018, the RELATOR acquired a new email address.

793.   On or about April 6, 2018, LAMPERT wrote an email (the "LAMPERT Email") to the
       BC Email Account with the subject line of "3L Gift Campaign."

794.   In the LAMPERT Email, LAMPERT encouraged the RELATOR to return to 885
       CENTRE STREET.

795.   On or about April 16, 2018, ULLMANN wrote an email to the BC Email Account with
       the subject line of "Prof. Ullmann here, hoping to talk to you" (the "ULLMANN Email").

796.   In the ULLMANN Email, ULLMANN encouraged the RELATOR to return to 885
       CENTRE STREET.

797.   On or about April 18, 2018, ABBENE wrote an email (the "ULLMANN Follow-Up
       Email") to the BC Email Account about the ULLMANN Email.

798.   In the ULLMANN Follow-Up Email, ABBENE encouraged the RELATOR to return to
       885 CENTRE STREET and referenced the ULLMANN Email.

799.   On or about April 18, 2018, an individual (the "Massachusetts Photographer") driving an
       automobile with Massachusetts license plates took one or more photographs of the

RELATOR while the RELATOR was sitting in his vehicle in the parking lot of the ESA
Nashua.

800.   The Massachusetts Photographer was and/or is an employee of the Commonwealth of
Massachusetts.*

801.   The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH
conducted surveillance of the RELATOR while the RELATOR was staying at the ESA
Nashua in order to develop grounds for seeking a court order to transfer the Second
Federal Action to the District of Massachusetts.*

802.   The OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH has
never denied in a court filing that the OFFICE OF THE ATTORNEY GENERAL OF
THE COMMONWEALTH or any employee of that Office accepted money in exchange
for non-prosecution of the *Qui Tam* Defendants.*

803.   During the period January 1, 2013 to December 31, 2016, one or more of the NAMED
ASSOCIATES and/or one or more employees of the OFFICE OF THE ATTORNEY
GENERAL OF THE COMMONWEALTH personally benefitted from the payments
made under the Equitable Sharing Program.

804.   On or about April 13, 2018, SWEENEY electronically filed a motion to extend the time
to respond to the Second Federal Action in the United States District Court for the
District of New Hampshire.

805.   On or about April 22, 2018, SAVERY wrote an email (the "SAVERY Email") to the BC
Email Account in which SAVERY encouraged the RELATOR to return to 885 CENTRE
STREET.

806. On or about April 26, 2018, SWEENEY made an electronic filing in the Second Federal Action in the United States District Court for the District of New Hampshire.

807. On or about April 26, 2018, the RELATOR filed a motion to disqualify the entire OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH (the "Motion to Disqualify") from participation in the Second Federal Action in the United States District Court for the District of New Hampshire.

808. On or about May 10, 2018, SWEENEY electronically filed an objection (the "Disqualification Objection") to the Motion to Disqualify in the United States District Court for the District of New Hampshire.

809. In the Disqualification Objection, SWEENEY stated that "[g]iven the fact that the Mullins Double Jeopardy decision provides a perfectly reasonable explanation for why no state criminal prosecutor has brought a CST enforcement prosecution since its issuance, Chawla's empty and inflammatory conjecture about the Attorney General's motivation in dismissing Gonzalez could not be more easily refuted."

810. In the Disqualification Objection, SWEENEY addressed the acceptance of one or more payments from the Equitable Sharing Program by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH during the pendency of the *Qui Tam* Action by stating that "[a]s a point of reference, that number represents .002% of the Attorney General's $149,748,467 unrestricted budget during those years."

811. In the Disqualification Objection, SWEENEY made no statement specifically denying that one or more payments from the Equitable Sharing Program influenced the decision by the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH to move to dismiss the *Qui Tam* Action.

812.   In the Disqualification Objection, SWEENEY made no statement specifically denying
that the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH had
a disqualifying conflict of interest in the Second Federal Action.

813.   On or about June 2, 2018, the RELATOR emailed a request to the Committee on
Financial Disclosure of the Administrative Office of the U.S. Courts seeking the financial
disclosure records (the "Judicial Financial Records Request") of two judges serving on
the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, namely
O'TOOLE and SOROKIN.

814.   The Judicial Financial Records Request did not seek the financial disclosure records of
any judges on the U.S. DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS except O'TOOLE and SOROKIN.

815.   On or about June 4, 2018, the RELATOR filed a motion for leave to amend the complaint
in the Second Federal Action in order to strike all allegations that the RELATOR was
and/or is a resident of the State of New Hampshire.

816.   On or about June 4, 2018, ABBENE sent an email to the BC Email Account inquiring
about whether the RELATOR would be withdrawing from BCLS.

817.   On or about June 7, 2018, SWEENEY electronically filed a motion to dismiss the Second
Federal Action (the "Motion to Dismiss the Second Federal Action").

818.   In the Motion to Dismiss the Second Federal Action, SWEENEY made no statement
specifically denying that one or more payments from the Equitable Sharing Program
influenced the decision by the OFFICE OF THE ATTORNEY GENERAL OF THE
COMMONWEALTH to move to dismiss the *Qui Tam* Action.

819. In the Motion to Dismiss the Second Federal Action, SWEENEY made no statement specifically denying that the OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH had a disqualifying conflict of interest in the Second Federal Action.

820. On or about June 11, 2018, SWEENEY made an electronic filing in the Second Federal Action in the United States District Court for the District of New Hampshire.

821. On or about June 22, 2018, the RELATOR visited the United States Court of International Trade in New York, New York and inquired with the United States Marshals Service and employees of that court regarding corresponding with Judge Gary Katzmann concerning his elevation to the United States Court of International Trade.

822. On or about June 26, 2018, one or more family members of the RELATOR was visited and questioned by the United States Marshals Service in or around New York, New York.

823. On or about June 28, 2018, the Second Federal Action was transferred from the U.S. District Court for the District of New Hampshire to the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS.

824. On or about June 29, 2018, the RELATOR communicated by telephone with more than one employee in the Clerk's Office of the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS in Boston, Massachusetts in order to alert that Office to preserve all records relevant to the assignment of a judge in the Second Federal Action.

825. On or about June 29, 2018, an individual in the Clerk's Office of the U.S. DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS in Boston, Massachusetts stated